# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| STEVE SIMMS, BRUCE IBE, WES LEWIS, CONSTANCE YOUNG, ROBERT FORTUNE DEAN HOFFMAN, KEN LAFFIN, DAVID WANTA, and REBECCA BURGWIN, individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> JERRAL "JERRY" WAYNE JONES, NATIONAL FOOTBALL LEAGUE, DALLAS COWBOYS FOOTBALL CLUB, LTD., JWJ CORPORATION, COWBOYS STADIUM, L.P., COWBOYS STADIUM GP, LLC, and BLUE & SILVER, INC., <br><br> Defendants. | **CONSOLIDATED SECOND AMENDED COMPLAINT – CLASS ACTION AND DEMAND FOR TRIAL BY JURY** <br><br> **Civil Action No.11-CV-00248 M** <br><br> (Consolidated with No. 11-CV-00345 M) |

Plaintiffs Bruce Ibe, Constance Young, Robert Fortune, Dean Hoffman, Ken Laffin, David Wanta, Rebecca Burgwin, and Jason McLear (collectively, "Plaintiffs") bring this suit against the National Football League (the "NFL") to recover the damages owed to themselves and others similarly situated.

## I.    JURISDICTION

1.1    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100

members, at least one of whom maintains citizenship in a state diverse from the defendant, and seeks in the aggregate more than $5,000,000, exclusive of costs and interest. On information and belief, more than two-thirds of the members of the Classes defined below are residents of states other than Texas.

## II.   VENUE

2.1    The events as alleged herein arose within this District, pursuant to 28 U.S.C. § 1391(a), and within this Division, and one or more of the Defendants are subject to personal jurisdiction in the District and Division to which this action has been assigned.

## III.   PARTIES

3.1    Plaintiff Bruce Ibe ("Ibe") is an individual residing in Allegheny County, Pennsylvania, a citizen of the State of Pennsylvania and a purchaser of tickets to Super Bowl XLV. Ibe is a representative plaintiff for the "Displaced Class" defined below.

3.2    Plaintiff Constance Young ("Young") is an individual residing in Lawrence County, South Dakota, a citizen of the State of South Dakota and a purchaser of tickets to Super Bowl XLV.   Young is a representative plaintiff for the "Relocated/Delayed Class" and "Obstructed View Class" defined below.

3.3    Plaintiff Robert Fortune ("Fortune") is an individual residing in Ashtabula County, Ohio, a citizen of the State of Ohio and a purchaser of tickets to Super Bowl XLV. Fortune is a representative plaintiff for the "Obstructed View Class" defined below.

3.4    Plaintiff Dean Hoffman ("Hoffman") is an individual residing in Putnam County, Tennessee, a citizen of the State of Tennessee and a purchaser of tickets to Super Bowl XLV. Hoffman is a representative plaintiff for the "Obstructed View Class" defined below.

3.5    Plaintiff Ken Laffin ("Laffin") is an individual residing in Wisconsin, a citizen of Wisconsin, and a purchaser of tickets to Super Bowl XLV.  Laffin is a representative plaintiff for the "Displaced Class" defined below.

3.6     Plaintiff David Wanta ("Wanta") is an individual residing in Wisconsin, a citizen of Wisconsin, and a purchaser of tickets to Super Bowl XLV. Wanta is a representative plaintiff for the "Displaced Class" defined below.

3.7     Plaintiff Rebecca Burgwin ("Burgwin") is an individual residing in Wisconsin, a citizen of Wisconsin, and a purchaser of tickets to Super Bowl XLV. Burgwin is a representative plaintiff for the "Relocated/Delayed Class" defined below.

3.8     Plaintiff Jason McLear ("McLear") is an individual residing in Texas, a citizen of Texas, and a purchaser of tickets to Super Bowl XLV. McLear is a representative plaintiff for the "Relocated/Delayed Class" as defined below.

3.9     Defendant National Football League ("NFL") is a business entity of unknown form which Plaintiffs are informed and believe is licensed to conduct business in the State of Texas. Defendant NFL may be served with process on its registered agent, CT Corporation System, 350 N. St. Paul Street, Ste. 2900, Dallas, TX 75201.

## IV.    STATEMENT OF FACTS

4.1     For decades, the NFL has routinely claimed that the Super Bowl is the pinnacle of all sporting events worldwide. And for decades, the NFL has made hundreds of millions of dollars by promoting the Super Bowl as the greatest single game of the year culminating in the crowning of the World Champion of the NFL. With full knowledge of these facts, the NFL, in tandem with the Dallas Cowboys organization and its owner Jerry Jones (collectively, the "Cowboys"), engaged in a failed and reckless attempt to maximize revenue and attendance at Super Bowl XLV and, in the process, betrayed the trust of many of its most loyal fans, including Plaintiffs. Simply put, the NFL placed its own outright greed ahead of the very fans whose support allows the NFL to prosper and further enrich Jones and the other team owners. This case is about the NFL's purposeful sale of Super Bowl tickets for seats they knew, or at the very least should have known, were not available, would never be available, and/or were substandard in that they afforded obstructed views. Further, this case is about the fact that instead of alerting the

fans and Plaintiffs prior to the game of these problems and providing them the opportunity to minimize their damages (i.e. purchase other tickets, cancel their travel plans, and/or make alternative arrangements), the NFL instead purposely chose to remain mute, hid the problems from the fans and Plaintiffs until the last possible moment on game day, thus deceiving them, and then attempted to sweep their conduct under the rug by making a series of false statements and purported "settlement offers" that fall short of adequately compensating Plaintiffs.   On information and belief, the NFL chose this course of action because it knew that if it were honest and forthright with the fans and Plaintiffs well prior to the game, as it should have been, a public relations nightmare would result, directing significant media attention surrounding Super Bowl XLV toward the NFL's conduct as opposed to the NFL and the Cowboys' efforts to break a meaningless attendance record.

A.      **The NFL Awards Super Bowl XLV to the Cowboys**

        4.2     In 2007, the NFL awarded the right to host Super Bowl XLV at Cowboys Stadium in Arlington, Texas to the Cowboys.  As host, a number of direct and indirect benefits flowed to the Cowboys, including but not limited to the following:

                (a)     Five percent (5%) of the available Super Bowl game tickets for use and/or sale by the Cowboys;

                (b)     The use of the Super Bowl and tickets for the Super Bowl as marketing incentives for season ticket and suite renewals; and

                (c)     Millions of dollars in ticket and parking taxes that reduced the debt owed by the Cowboys relating to the construction of Cowboys Stadium.  Because this stadium debt had been personally guaranteed by Jones, Jones had a personal incentive to cram as many people in Cowboys Stadium as possible.  Jones was further incentivized by the fact that at all relevant times, Jones had an ownership stake in the concessions company that operates at Cowboys Stadium.  Accordingly, Jones received monetary benefits from every food and beverage item sold at Cowboys stadium during Super Bowl XLV.

4.3     The ability to host a Super Bowl was purportedly an important consideration from the earliest stages in the process of designing and constructing Cowboys Stadium.  In early January 2011, Bryan Trubey, the Chief Designer of Cowboys Stadium and an agent of the Cowboys, stated: "The big innovation here . . . is that we started thinking about the special events.  How do we stage a Super Bowl that's the best ever, designed around those events.  That's the reason the Super Bowl here will be in a lot of different ways almost for every patron an over the top, even by comparison to all prior Super Bowls, really an over the top experience."

4.4     As part of the bid to host the Super Bowl, the Cowboys' plans called for approximately 13,000 temporary seats to be built.  The NFL and the Cowboys subsequently assumed responsibility for the construction of the temporary seats.  To ensure the seats would be ready for Super Bowl XLV, the NFL and the Cowboys knew that, well in advance of game time, (a) they would have to timely submit the seating plans to local authorities, (b) they would have to obtain all necessary permits from local authorities, (c) they would have to undertake, and complete, installation of the seats, (d) the seats would have to be safe, comply with all local safety requirements, and pass safety inspections conducted by the City of Arlington and its Fire Department, and (e) they would have to verify that none of the seats had obstructed views of either the field or the stadium's prized video replay board.

4.5     On or about June 23, 2010, Seating Solutions was hired to assist the NFL and the Cowboys in ensuring the requirements of Paragraph 4.4 were met well prior to the day of the game. After being retained, Seating Solutions stated on June 23, 2010 in a press release that their goal was to "maximize capacity at the stadium."  The release went on state:  "The newly built Cowboys Stadium has already made a monumental name for itself.  One of the most talked about features at the Stadium, are the largest 1080p HDTV screens ever built with measurements totaling 60 yards."  The press release, which was designed to reach the fans and Plaintiffs, further stated:  "Seating Solutions must also design a system that can be set up and broken down quickly and safely while affording NFL fans the comfort and sightlines they are accustomed to."  Seating Solutions added by way of the release on June 23, 2010, "Between Super Bowl XLV, the

Cowboys' big screen TVs, and Seating Solutions, watching the Super Bowl in the stadium will be as comfortable as watching it at your home with 90,000 friends." On information and belief, the NFL and/or the Cowboys reviewed this press release for accuracy prior to its issuance.

4.6     On January 27, 2011, Seating Solutions claimed the seats were completed and of high quality. In fact, on that date, in an additional press release designed to reach the fans and Plaintiffs, Seating Solutions stated: "Encompassing 73 total acres, 3 million square feet, the largest high definition video screen which hangs from the 20 yard line to 20 yard line and the ambitious goal of breaking the attendance record for the Super Bowl, Cowboys Stadium is the world's biggest domed stadium. To achieve this historic record setting feat, Seating Solutions was called in for seating maximization and now the world will be witnessing the largest attended Super Bowl in history." Seating Solutions went on to state in the release: "Our experience allowed us to offer high quality temporary seating for a custom facility and our manufacturing capabilities allowed us to create custom modules that addressed not only comfort and sight-line issues, but more importantly maintained the NFL's primary concern for spectator's safety and quality of the experience." It added that they had "created a terrific fan experience in every way maximizing safety, comfort and sight-line." On information and belief, the NFL and/or the Cowboys also reviewed this press release for accuracy prior to its issuance. As Plaintiffs would later discover, however, the statements made in this press release and the June 23, 2010 press release were patently false. For instance, the seats had not yet even been completed, were certainly not safe and certainly did not offer appropriate "sight-lines" or a "quality experience." Further, Seating Solutions failed to inform the fans and the Plaintiffs that the video board the NFL and the Cowboys trumpeted repeatedly could not even be seen from many of the seats they had installed.

**B.     Cowboys Stadium's Prized Digital Video Replay Board**

4.7     An integral part of the fan experience at Cowboys Stadium, as described and touted at nearly every possible opportunity by the NFL and the Cowboys, is the stadium's

signature video/replay board (the "Video Replay Board").  Among other things, the Video Replay Board allows fans to view replays – a critically important part of any game, let alone the Super Bowl.  The Video Replay Board hangs approximately 90 feet above the field and spans 60 yards.  It weighs about 170,000 pounds with a screen area of 11,393 square feet.  The Video Replay Board cost more than $40 million when constructed and contains four video boards, two facing the sidelines and two smaller ones facing the end zones.  In fact, the Video Replay Board alone cost more than the entire construction cost of Texas Stadium, which served as the home of the Cowboys during the years 1971 – 2008.

4.8    In early January 2011, Chief Designer Trubey stressed the importance of the Video Replay Board to fans attending the Super Bowl by stating publically that the board had "refined what viewing an NFL event is like being in a stadium."  He added that the board's control room "really drives all the entertainment that shows up in the [Stadium] and contributes to the experience of being at the game, as totally unique to anything you could ever get at home."  He further stated, "So you have great high definition delivery of the game on a 72 tall by 168 foot long video board, so your upper deck seats are phenomenal, no obstructed views, everybody gets a great view of the action."  In fact, discussing the Video Board just prior to Super Bowl XLV on or about January 28, 2011, Jones stated: "[o]ne of the things that I'm the proudest of is that from every spot within this stadium, because of our digital board, is that when you're looking at the field, you're looking at the field from the perspective of where you are in the stadium.  And so you don't see a 50 yard line shot if you're looking up-field in the end-zone.  You see the team going that way up-field.  And so we have 8 separate digital cameras that [as] the fans are looking at the game they know exactly the positioning of the team that they're seeing out on the field.  It's all done in real-time, there is not a nano-second of difference between what's on the screen and what's happening on the field.  When you're on the field and you look back up, everything above-ground-level, the stadium is built so that it's leaning back over the field.  And so that when you're down there you have the feel that the stands are hovering over you.  Now that's one thing if you're in a room 20 by 20, but when you're 3 million square feet and you've got the size of

this stadium hovering over you, it gives you an intimacy." On January 27, 2011, the Cowboys' spokesman, Brett Daniels, stated to various media outlets while at the stadium that the NFL was taking advantage of the stadium's signature Video Replay Board for the Super Bowl and that the Video Replay Board would allow fans attending the Super Bowl to enjoy pre-game programming while awaiting the start of the game. Daniels further stated: "We're going to try and get as many people in to see the Super Bowl as we can."

    4.9    As recounted in an article titled "Massive Cowboys Stadium Scoreboard to Star in Super Show," which appeared in the *Fort Worth Star-Telegram* on February 5, 2011, the NFL likewise touted the Video Replay Board during the week leading up to the game as an integral part of having a ticket to the Super Bowl. "Just look at it," Bill McConnell, the NFL's Director of Event Operations, stated while gesturing upward towards the Video Replay Board during a tour of the stadium in Arlington. McConnell went on to state and explain that the board would serve as an integral part of the Super Bowl's pregame, halftime and postgame shows for fans in attendance at the game.

**C.**    **The NFL and the Cowboys' Goal of Breaking the Super Bowl Attendance Record**

    4.10    In the year leading up to Super Bowl XLV, the Cowboys and the NFL made it a goal for Super Bowl XLV to break attendance records and used this goal as their guidepost when deciding how to conduct themselves. In fact, Jones was unabashed in his desire to set the attendance record at all costs. For instance, Jones and the NFL outfitted the end zone open areas, space which is normally reserved for standing-room only tickets, with temporary seating. The Cowboys and the NFL also sold approximately 4,000 tickets for fans to stand outside Cowboys Stadium and watch the game on a big-screen TV at $200 per ticket. These "tickets" were sold out almost less than two weeks after going on sale on January 18, 2011.

    4.11    On December 27, 2010, the NFL issued a detailed posting on their website designed to educate fans and Plaintiffs on the importance of valid Super Bowl tickets. In the very first sentence, the league declared: "Super Bowl tickets are the Holy Grail for die-hard NFL

football fans."  Approximately one month later, during the week of January 24, 2011, Jones publically compared the speed with which fans purchased Super Bowl XLV tickets to "a shark hitting red meat" and, emboldened by the brisk sales, proclaimed:  "We're thinking of selling more tickets. I know this:  However many we print, people will buy."

**D.**     **The NFL's Own Guidelines Requiring Disclosure of Obstructed Views on Tickets**

4.12     On December 27, 2010 and continuing through the date of Super Bowl XLV, the NFL, via its website, touted its own NFL Ticket Exchange to fans and Plaintiffs as a "secure, official resale marketplace to purchase Super Bowl tickets."  The league further advised fans and Plaintiffs that buying elsewhere could leave "you open to fraud."  The NFL also stated: "Purchase your Super Bowl tickets on the Official NFL Ticket Exchange with confidence knowing that they are 100 percent legitimate."  Moreover, the league cautioned fans purchasing Super Bowl tickets elsewhere to "verify the location of the seats on a seating chart to avoid being misled into purchasing obstructed view seats or seats that simply do not exist." In fact, at all relevant times, the NFL's own guidelines instructed fans reselling tickets on the "Official Ticket Exchange of the NFL" as follows:

(a)     "Important:  You must indicate if the view is obstructed[,]"

(b)     "[i]t is important that you indicate any details that accompany your tickets such as obstructed view," and

(c)     "[i]t is also your responsibility to determine . . . whether the ticket is for a location that includes an 'Obstructed View[.]'"

**E.**     **Tickets to Super Bowl XLV**

4.13     Tickets to Super Bowl XLV were originally sold to the fans, members of the classes defined below and Plaintiffs by the NFL and the Cowboys.  For instance, the Cowboys received five percent (5%) percent of the available Super Bowl game tickets from the NFL for resale to fans.  On information and belief, most, if not all, of these tickets were subsequently sold

to the fans, members of the classes defined below and one or more Plaintiffs.  For instance, attached hereto as Exhibit A and incorporated herein by this reference are exemplars of redacted invoices for Super Bowl tickets and parking passes sold by the Cowboys.  In connection with the payment of the Cowboys' invoices for Super Bowl tickets and parking passes, the Cowboys instructed purchasers to make their check payable to "Dallas Cowboys."  On information and belief, these payments were subsequently deposited into accounts belonging to the Cowboys.  Further, when payment was made by credit card, the merchant was listed as "Dallas Cowboys."  In addition, the Cowboys caused Super Bowl tickets purchased from the Cowboys to be sent via Federal Express from the Cowboys to purchasers.

      4.14    Tickets for Super Bowl XLV provide in part the following:

      (a)    This ticket grants entry in the stadium and a spectator seat for the game.

      (b)    The ticket holder will have an assigned seat at Super Bowl XLV at Cowboys Stadium corresponding to a specific section number, row number, and seat number;

      (c)    Super Bowl XLV will take place on Sunday, February 6, 2011, at 5:00 p.m. and ticket holders will have the ability to enter the stadium when stadium gates open at 1:00 p.m.

      4.15    None of the tickets for Super Bowl XLV purchased and/or acquired by Plaintiffs contain any reference alerting the purchaser to the seats being temporary seats, or having obstructed views of the field, stadium, or Video Replay Board.  The NFL failed to provide this material information to Plaintiffs.

**F.**      **Problems With the Approval and Construction of the Temporary Seats and the NFL and Cowboys' Knowledge and Failure to Alert Fans Regarding The Problems**

      4.16    Despite awarding Super Bowl XLV three years prior and aware of the need to install temporary seating at Cowboys Stadium, as of September 2010, the NFL still had not applied for a permit or submitted plans to local authorities to install the seats.  On September 8, 2010, the City of Arlington (the "City" or "Arlington") Building Official Ed Dryden sent an e-

mail to Cowboys Stadium General Manager Jack Hill stating with regards to the installation of "Temporary Bleacher Seating" that "[a]s of today, there's not been any communication with your vendor and the City. We will expect to see permits with plans submitted for review of the seating." The NFL and the Cowboys did not disclose this fact to the fans or Plaintiffs.

4.17    On September 22, 2010, Dryden sent an e-mail to Hill setting forth in detail what the City expected to see on the plans with the permit application prior to installation of any of the temporary seating. In this e-mail, Dryden noted that "the Cowboy organization is responsible for providing the additional seating."

4.18    Three months later, plans had still not been submitted to the City. On or about December 22, 2010 (46 days before kickoff), Arlington Assistant Fire Marshal Stephen Lee told Arlington fire officials: "We still have not received any plans on the plaza bleachers from the Cowboys." Dryden e-mailed Hill, informing him "[t]o date the City has not received any permit application with any plans for any of the additional bleachers seating planned for the Super Bowl." The NFL and the Cowboys did not disclose this fact to the fans or Plaintiffs.

4.19    Thirteen (13) days later, on or about January 5, 2011, the NFL and/or the Cowboys finally applied for a building permit for the temporary seats.

4.20    On January 7, 2011, the 2011 AT&T Cotton Bowl Classic was played at Cowboys Stadium. This was the last pre-Super Bowl XLV event to take place at Cowboys Stadium, paving the way for the construction of the temporary seats and other physical preparations for Super Bowl XLV.

4.21    On January 12, 2011, City official Rick Ripley informed building official Ed Dryden that he found 40 problems with the "revised plans" for the temporary seating, including a lack of an engineer's seal or signature. The NFL and the Cowboys did not disclose this fact to the fans or Plaintiffs.

4.22    On January 13, 2011, the City granted a "conditional permit" for phased approval of the temporary seats, providing that installation of the seats would be subject to approvals of

field safety inspections before the temporary seating may be deemed safe and used for seating. The NFL and the Cowboys did not disclose this fact to the fans or Plaintiffs.

4.23    A week later on January 20, 2011, Mr. Dryden provided the NFL and the Cowboys with a list of problems inspectors found with the work involved in installing the temporary seats, including, without limitation, a lack of a full set of drawings.  Dryden warned the NFL and the Cowboys "the day of the event is 16 days away and some of these issues are significant and from our perspective there's not a great deal of progress that we can see."  The NFL and the Cowboys did not disclose these facts to the fans, including Plaintiffs.

4.24    Despite the problems known to Jones and the NFL and the Cowboys in the construction of the seats, on or about January 26. 2011, Mr. Jones stated to the *Fort Worth Star Telegram* the following with the intention that his statement would reach the fans and Plaintiffs: "I think we've got a good chance to break the record without counting anything outside.  The stadium is certified for 111,700.  When we built this stadium, I had in mind being able to reach those kinds of numbers."

4.25    On or about January 27, 2011, City Fire Chief Don Crawson sent an e-mail reporting "a series of concerns regarding the construction of the temporary seating in Cowboys' Stadium for Super Bowl 45" and complaining that he still did not have a certified letter from an engineer detailing the structural stability of the temporary seating areas or a total count of all seating inside the stadium.

4.26    Yet, at the same time the City was expressing its concerns about the temporary seats, the NFL and the Cowboys remained silent with the public and Plaintiffs about any seating problems, and in fact, communicated that there were no problems at all.  By way of example only, during the week of Monday, January 24, the NFL and the Cowboys communicated the following:

(a)    Bill McConnell, the NFL's Director of Event Operations, stated to the local media on January 27, 2011 while in Arlington, Texas that the temporary seating would be

ready by early the next week. At the time Mr. McConnell made his statement, he made it with the intent that it would be disseminated to Plaintiffs and the fans.

       (b)    NFL spokesman Brian McCarthy announced that about 105,000 fans are expected to attend the Super Bowl, which would break the Super Bowl attendance record.

       (c)    Cowboys Stadium spokesman Brett Daniels represented on January 27, 2011, "There's about 15,000 extra seats we were able to put in place here and things we were able to do with the rails and the bowl seating." He continued: "[w]e're going to try to get as many people in to see the Super Bowl as we can."

    4.27    As of January 27, 2011, the NFL and the Cowboys also knew that seats for tickets already sold or being sold to fans were not in a fixed, permanent location within the stadium, but instead would be temporary, be moved to different areas of the stadium, would not have a view of the game and the stadium's signature Video Replay Board, and/or might be taken out completely. For example, as of January 27, 2011, NFL Director of Event Operations McConnell admitted that many fans who bought tickets would not be able to see the Video Replay Board and that many obstructed view seats would remain. McConnell assured fans and the Plaintiffs, however, that buyers of obstructed seats would be informed of the obstructions prior to purchase, stating "some obstructed-view seats could remain as long as buyers are aware of their limitations." McConnell's assurance was patently false, however, because as the NFL and McConnell well knew as of the date of his statement, most, if not all, of the tickets at issue *had already been sold*. As a result, it was impossible for a buyer to have been made aware of the tickets' obstructed view prior to purchasing the tickets. McConnell also falsely assured fans and Plaintiffs that "Our ticketing people are going to go through with the people that are building the seats to make sure which ones are obstructed and which ones aren't. . . . There is a process in place to determine which seats will be included on game day." On information and belief, the NFL never engaged in this process and/or performed this process in a grossly negligent manner.

    4.28    On or about January 29, 2011, at an operations meeting of the Cowboys, its contractors, the NFL's Super Bowl event manager, and City officials, the General Manager for

Cowboys Stadium reported a list of items that still needed to be addressed by game-time, including several items required for completion of the temporary seating.  At this meeting, the NFL and the Cowboys' contractor acknowledged the need for an engineer report approving the as-built design.  The NFL and the Cowboys did not disclose these facts to the fans or Plaintiffs.

4.29   Still aware that the temporary seating had not yet been approved, Mr. Jones nevertheless continued to broadcast his desire of breaking the Super Bowl attendance record and expressing confidence that it could be done, telling USA Today on or about January 30, 2011: "I know the stadium can handle it [i.e. the increased attendance], relative to restrooms, space and concessions" and "You want to do something that's never been done before."

4.30   By February 2, 2011 (only 4 days before kickoff), seeing little progress on the temporary seating construction, City Fire Chief Crawson sent a stern warning to Cowboys Stadium General Manager Jack Hill, expressing doubts about "the effective completion" of the temporary seating project, stating in part:

> Arlington Fire Inspectors and the Arlington Building Official have worked diligently with your contractor throughout the month of January.  During this period the city identified multiple issues in the construction phase of the installation effort.  Many of the issues previously identified are still not resolved with just over three days left before the Super Bowl.  I'm very concerned that there is not currently a certified Engineering report confirming the structural stability of the 'as built' seating/stands.

Crawson's e-mail continued:

> I've directed Arlington Fire Inspector personnel to continue providing immediate code compliance assistance in order to ensure that all identified issues are resolved as soon as possible.  Our team will be available 24 hours a day to address temporary seating/stands issues with members of your team and the

contractors responsible for temporary seating/stands installation at

Cowboys Stadium.

He further stated: "I'm also concerned about the effective completion of this project. There have been multiple meetings with your contractor where agreed upon goals and timelines were established and, subsequently, not met nor completed to standard." The NFL and the Cowboys did not disclose any of these facts to the fans or Plaintiffs.

4.31    The next day, on February 3, 2011, Cowboys Stadium Manager Hill sent a progress report to the NFL and members of the Jones family regarding, among other things, his "two biggest areas of concern" - one such concern being the temporary seating, and confirming that the temporary seating had not yet been completed or approved. The NFL and the Cowboys did not disclose this fact to the fans or Plaintiffs.

4.32    On February 4, 2011, NFL Commissioner Goodell held a Super Bowl XLV news conference in Dallas before hundreds of members of the media around the entire world. On information and belief, even though he knew about the problems with the approval and construction of the temporary seating, Commissioner Goodell said nothing about this issue. Instead, he deliberately chose to ignore the issue and told fans "it's going to be a fantastic Super Bowl here." Goodell further stated, in part:

>We know that we are going to have a great weekend, but we want
>to thank the leadership here in this community for all they have
>done. All of the public officials who have been focused, prepared
>for all outcomes. You can see it in the way they are dealing with
>the issues. This storm is approaching and attacking most of our
>country, and here in North Texas we are prepared and all of our
>events are going on as scheduled, and we are grateful to all of
>them. That includes Jerry Jones, and his family of course, who
>have been working tirelessly to make this a great event, and Bill
>Lively, the head of the North Texas Super Bowl Host Committee.

> To you and your organization, an extraordinary job.  I know we
> have a few days left, but we are grateful for all of the work you've
> done to make this a great weekend.

4.33    At another opportunity during the news conference to address the seating issues at
Cowboys Stadium for the game, Goodell again ignored the issue and continued:

> [W]e're going to be playing, and you're going to be seeing the
> Super Bowl from one of the great stadiums in the world.  I think
> that will demonstrate the importance of having great facilities for
> all of our games, including the Super Bowl. . . . As I say, I think
> this community has done an extraordinary job under some very
> difficult circumstances that are across this country today.

## G.    Game Day Arrives, the Seats Are Still Not Ready, and Not a Single Fan Has Been Notified

4.34    On February 6, 2011, Cowboys Stadium in Arlington, Texas played host to Super
Bowl XLV.  In anticipation of the Super Bowl, approximately 103,000 people, including
Plaintiffs, appeared at Cowboys Stadium with tickets in hand, excited to witness Super Bowl
XLV in person.  In many instances, putative class members paid thousands of dollars to be seated
at the Super Bowl and traveled to Cowboys Stadium from around the country, and in some cases
the world, in order to witness the Green Bay Packers play the Pittsburgh Steelers at Super Bowl
XLV.  In fact, approximately one week before the game, on January 30, 2011, the NFL Ticket
Exchange announced that the average selling price for a Super Bowl ticket was $4,091, up 27%
from 2010, with the most expensive ticket selling for $15,946.  Moreover, it was then estimated
that a 4-day, 3-night trip to attend to the Super Bowl would cost between $5,106 and $16,328 per
person not including certain incidental expenses.

4.35    As game time neared, the temporary seating still had not been completed or
approved nor had the fans and Plaintiffs been adequately informed.  For instance, in the early

hours of the morning on game day, City building official Dryden sent several e-mails to the Cowboys and the City Fire Marshal about numerous deficiencies, including missing or improperly installed handrails, missing guardrails, loose seats and loose steps.  Dryden sent an e-mail to Jim Parajon, City Director of Community Development and Planning, stating "[t]here's still no absolute finality on the seat count.  I think that the Cowboys are not going to correct certain items and assume the risk.  This is not a good situation!"  Parajon responded, saying city administrators have been notified and "Bottom line is if it is not right, don't approve it."

4.36   Just before 1:00 p.m., City Assistant Fire Chief Jim Self told city officials that some seats in the upper concourse of the west end zone "may be lost, DC (Dallas Cowboys) working on solution.  Maybe between 1,300 lost seats due to incomplete construction."

4.37   Around 2:30 p.m., NFL spokesman McCarthy sent a draft statement about the seating problems to City police officials and the Cowboys before releasing it to the media.  The draft statement did not contain numbers, indicating that even at three hours before kickoff, it was still unclear how many seats might be closed off.

4.38   Around 4:05 p.m., just 90 minutes before kickoff, the NFL issued its first official statement which read:  "[t]here are a limited number of sections in temporary seating areas inside the stadium that have not been fully completed."

## H.   Plaintiffs Are Denied Seats, Relocated to Inferior Seats, Delayed, and/or Directed to Seats With Obstructed Views

4.39   Approximately 103,219 people ultimately crammed into Cowboys Stadium to watch the Steelers-Packers game, ranking Super Bowl XLV as the fourth most attended Super Bowl and missing the all-time attendance record by 766.  Unfortunately, however, thousands of ticket holders to Super Bowl XLV never got what they bargained for or what was promised to them.

4.40   Specifically, the "Obstructed View" fans, including but not limited to Plaintiffs Fortune, Hoffman, and Young arrived at the stadium on Sunday to discover that the NFL had

assigned them to temporary seats with obstructed views of the field and the stadium, which had been installed in an effort to meet Jones' goal of breaking the attendance record. In addition, almost all of these seats lacked any reasonable view of the stadium's prized Video Replay Board.

4.41   In addition, an estimated 2,924 ticket holders, including but not limited to Plaintiffs Young, Burgwin, and McLear were unreasonably relocated and/or delayed from their seats at Super Bowl XLV as a result of the incomplete installation of temporary seats, which were deemed unsafe and unusable. The entirety of this group comprising was significantly delayed in gaining pre-game access to their seats due to the problems with the installation of some of the temporary seats at Cowboys Stadium. A subset of this group, consisting of at least 876 ticket holders, including Plaintiffs Burgwin and McLear, arrived to the February 6, 2011 Super Bowl game and were told that there were problems with their assigned seats at Cowboys Stadium and that they would be relocated to different seats in the stadium. Ultimately, these individuals were provided with different seats than they had anticipated which were inferior in location and/or quality than the seats that these ticket holders had previously purchased and/or acquired.

4.42   Furthermore, a group comprising approximately 434 ticket holders, including but not limited to Plaintiffs Ibe, Laffin, and Wanta, was completely displaced from their seats at Super Bowl XLV as a result of the incomplete installation of temporary seats, which were deemed unsafe and unusable. Accordingly, these approximate 434 ticket holders were denied seats to the game altogether, and forced to watch the game on monitors in a partially below-ground "club" (the Miller Lite Club), where they had no view of the field whatsoever.

4.43   In the meantime, while these thousands of fans were left to fend for themselves, Jones was busy entertaining numerous celebrities in his luxury suite at the game, including Michael Douglas, Catherine Zeta-Jones, Ashton Kutcher, Demi Moore, Harrison Ford, Al Michaels, Maroon 5's Adam Levine, Victoria's secret model Anne Vyalitsyna, John Legend, and Sports Illustrated Swimsuit model Christine Teigen. On information and belief, at no time did

Jones attempt to actually assist any fan in finding a seat nor did Jones ever extend a simple invitation to any fan to watch the game in his luxury suite.

4.44    On the afternoon of the game, Brian McCarthy, Public Relations Director for the NFL, tweeted the following false statement relating to the seating debacle to hundreds of followers and members of the media: "Another 850 fans were affected by incomplete installation of temp seats and were relocated to similar or better seats in stadium." The next morning, on February 7, 2011, McCarthy further tweeted to hundreds of followers and members of the media: "The 400 fans w/out seats last nite went on field postgame, received free merchandise, food, beverage, $2,400, free SB46 tix." Despite knowing both of these statements were outright false and designed to deceive fans, the media and the public at large, Mr. McCarthy nonetheless made these statements as part of the NFL's attempt to "spin" the seating debacle and quiet the resulting public outcry.

I.    **After the Game, the NFL and the Cowboys Admit They Knew About the Problems With Approval and Construction of the Temporary Seats**

4.45    On Monday, February 7, 2011, the NFL and Cowboys conceded that they knew of the seating dilemma earlier in the week and had hoped until hours before kickoff that these problems could be fixed, but failed and refused to advise the ticket holders of these problems until they reached the stadium.

4.46    That same day, Jones admitted to the error, stating: "The incomplete installation of temporary seats left a limited number of sections unusable for yesterday's game. Manpower and timing issues caused inconveniences to some fans. At the end of the preparations, approximately 475 fans attending the game were not able to watch from those installed seats. We deeply regret their Super Bowl experience was impacted by this error, and we share that responsibility with the NFL." Jones also alluded to his goal of packing the stadium, admitting that "[o]ur collective goals all along were to ensure that more than 103,000 people would be able to have an enjoyable game day experience on Super Bowl Sunday[.]"

4.47    Likewise, NFL Commissioner Roger Goodell admitted to the wrongdoing, stating: "It was obviously a failure on our behalf, and we have to take responsibility for that."

4.48    NFL Executive Vice President Eric Grubman admitted that the NFL knew well before the game that the seats were not going to be available, stating that he "felt in the middle of the week that it was going to be a problem," and yet it made a conscious "judgment" not to inform ticket holders prior to the game in order to induce the fans to travel to the stadium only to then discover that they had substandard seats or no seats at all: "[w]e made a judgment that it was the right course of action to bring the fans in, rather than discourage them, or create a sense that they wouldn't have the information necessary." Later in the week, Grubman again conceded he did not want to disclose the seating problems to the fans to avoid a public relations disaster for the NFL, remarking in an interview with ESPN Dallas: "as I think about it now, I'm not sure that" letting people know earlier in the week "would have done any good. Imagine the chaos, if we would have announced that we're not sure what seats we have, but we might have all of them."

4.49    NFL spokesman Greg Aiello also confirmed the NFL knew about the seating problems well in advance of game time, stating via e-mail that the temporary seating "was an issue throughout the week that unfortunately did not get resolved."

4.50    City of Arlington Mayor Robert Cluck also stated after the game the seating problem "wasn't totally unexpected, though, because they were telling me they weren't going to make it."

4.51    In the days and weeks after the game, the NFL also conceded that breaking the Super Bowl attendance record was a priority. NFL Executive Vice President Grubman admitted on February 10, 2011: "Yes, I think [the Cowboys] were very interested in breaking the record." On February 7, 2011, the seating contractor tasked with adding the 13,000 or so temporary seats, called it "a daunting project. I don't think there's been another Super Bowl where they've added half this many seats."

4.52    After this lawsuit was filed, the NFL issued a letter on or about February 15, 2011 to affected fans, signed by Commissioner Goodell, stating "We deeply regret the mistakes that we made at Super Bowl XLV. We cannot replace the unsatisfactory experience that you endured and we take full responsibility for what happened." On or about February 25, 2011, Jones told the press "I do, along with the NFL, take responsibility for the seating issue." He continued: "Some of the things we would like to improve on regarding the seating issue, informing the fans that were involved, all of those areas, the NFL and I take responsibility for."

4.53    Additionally after the lawsuit was filed, and as part of their alleged attempt to supposedly "take responsibility," the NFL began issuing settlement "offers" to a small percentage of putative class members and Plaintiffs. These "offers," however, do not provide full compensation to Plaintiffs for their damages. For instance, among other things, the offers fail to fully reimburse Plaintiffs for all of their associated incidental expenses, costs and damages associated with attempting to attend game. Moreover, they fail to adequately compensate Plaintiffs for the actual loss of attending the game, a once-in-a-lifetime experience for most, and witnessing the game uninterrupted and unobstructed as any normal fan would. Finally, the vast majority of putative class members have yet to receive any offer for any compensation from the NFL. For instance, the NFL has yet to offer any compensation to any fan or Plaintiff who was sold an obstructed view seat without adequate disclosure.

## V.    CLASS ACTION ALLEGATIONS

5.1    Plaintiffs bring this action on their own behalf, and as a class action on behalf of the Classes defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3). The Classes consist of potentially thousands of ticket holders to Super Bowl XLV victimized by the NFL's breach of contract and fraud. Specifically, Plaintiffs bring this suit on behalf of the following three Classes:

**The "Displaced Class"**:  All persons who paid for and/or acquired tickets to Super Bowl XLV for one of the following seats within Cowboys Stadium:  Section 425A, Row 22, Seats 6-21; Rows 23-32, Seats 4-21; Row 33, Seats 1-21; and Section 430A, Row 22, Seats 13-28; Rows 23-32, Seats 13-30; Row 33, Seats 13-33.  The class excludes counsel representing the class and all persons employed by said counsel and/or who attended the game at the invitation of counsel, governmental entities, the NFL, any entity in which the NFL has a controlling interest, the NFL's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

**The "Relocated/Delayed Class"**:  All persons who paid for and/or acquired tickets to Super Bowl XLV for one of the following seats within Cowboys Stadium:   Sections 205A, 215A, 230A, 240A, 426A, 427A, 428A, and 429A – all rows and all seats; Section 425A – Row 11, Seats 22-33; Rows 12-18, Seats 22-31; Rows 19-32; Row 33, Seats 22-36; Section 430A, Row 11, Seats 1-12; Rows 12-18; Rows 19-33.  The class excludes counsel representing the class and all persons employed by said counsel and/or who attended the game at the invitation of counsel, governmental entities, the NFL, any entity in which the NFL has a controlling interest, the NFL's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial

officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.  This class has the following two Subclasses:

        1.    <u>The Delayed Subclass.</u>  All persons who were delayed in gaining access to their seats because the seats were not ready by the time the gates of Cowboys Stadium opened at 1:00 p.m. on game day as promised in the tickets.  This Subclass consists of all persons who paid for and/or acquired tickets to Super Bowl XLV for any of the seats identified above.

        2.    <u>The Relocated Subclass.</u>  All persons who were relocated from their assigned seat as listed on their ticket to other seats in the stadium of a lesser quality (i.e. higher row and/or lesser yardline).  This Subclass consists of all persons who paid for and/or acquired tickets to Super Bowl XLV for one of the following seats within Cowboys Stadium:  Sections 205A, 215A, 230A, and 240A – all rows and all seats.

**The "Obstructed View Class"**:  All persons who paid for and/or acquired tickets to Super Bowl XLV for a seat within Cowboys Stadium in one of the areas identified in Exhibit B to this Complaint and whose ticket did not disclose an obstructed view.  The class excludes counsel representing the class and all persons employed by said counsel and/or who attended the game at the invitation of counsel, governmental entities, the NFL, any entity in which the NFL has a controlling interest, the NFL's officers, directors, affiliates, legal representatives, employees, co-conspirators,

successors, subsidiaries, and assigns, any judicial officer presiding
over this matter, the members of their immediate families and
judicial staff, and any individual whose interests are antagonistic to
other class members.

5.2     The NFL subjected Plaintiffs and each of their respective Classes to the same
wrongdoing and harmed them in the same manner.  Now, Plaintiffs and each of their respective
Classes seek to enforce the same rights and remedies pursuant to the same legal theories: (A)
breach of contract; and (B) fraudulent inducement.

5.3     Numerosity:  The proposed classes are so numerous that individual joinder of all
their members is impracticable.  While the exact number and identities of the Class Members are
unknown at this time, such information can be ascertained through appropriate investigation and
discovery.  It is estimated that the "Displaced Class" consists of approximately 434 members.  It
is estimated that the "Obstructed View Class" consists of approximately 6,204 members.  It is
estimated that the "Relocated/Delayed Class" consists of approximately 2,924 members.  The
disposition of the claims of these Class Members in a single class action will provide substantial
benefits to all parties and to the Court.

5.4     Typicality:  Plaintiffs' claims are typical of the claims of their respective Classes
in that their claims arise from the same event or practice or course of conduct that gives rise to
the claims of other class members, and is based on the same legal theory as their claims.

5.5     Adequacy of Representation:  Plaintiffs will fairly and adequately represent and
protect the interests of the Classes.   Undersigned counsel has substantial experience in
prosecuting complex lawsuits and class action litigation.  Plaintiffs and undersigned counsel are
committed to vigorously prosecuting this action on behalf of the Classes, and have the financial
resources to do so.  Neither Plaintiffs nor their counsel have any interests adverse to the Classes.

5.6     Superiority of Class Action and Impracticability of Individual Actions: Plaintiffs
and the members of the Classes suffered harm as a result of the NFL's unlawful conduct.  A

class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual joinder of all members of the Classes is impractical. Even if individual Class Members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by the NFL's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class Members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the Class Members. Adjudication of individual Class Members' claims with respect to the NFL would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication, and could substantially impair or impede the ability of other Class Members to protect their interests.

5.7    <u>Common Questions of Law and Fact Predominate</u>: In addition, the requirements of Federal Rule of Civil Procedure 23 are satisfied by questions of law and fact common to the claims of Plaintiffs and of each member of the Classes and which predominate over any question of law or fact affecting only individual members of the Classes. Common questions of law and fact include, but are not limited to, the following:

a.    The questions of law and fact common to the Displaced Class include the following: (i) were members of the Displaced Class denied a seat to watch Super Bowl XLV?; (ii) was the denial of a seat a breach of contract under the ticket contract, which provides that the ticket grants entry to the stadium for a spectator seat for the game?; and (iii) are members of the Displaced Class entitled to damages for breach of contract?

b.    The questions of law and fact common to the Relocated/Delayed Class include the following: (i) were members of the Delayed Subclass delayed in gaining access to their seats because the seats were not ready by the time the gates of Cowboys Stadium opened at 1:00 p.m. on game day?; (ii) was this delay a breach of contract under the ticket contract, which

expressly provides that stadium gates open at 1:00 p.m.?; (iii) are members of the Delayed Subclass entitled to damages for breach of contract?; (iv) were members of the Relocated Subclass relocated from their assigned seats as listed on their tickets to lesser quality seats within Cowboys Stadium?; (v) was this relocation of class members a breach of contract under the ticket contract, which expressly provides that class members are to receive the assigned seat listed on the ticket?; and (vi) are members of the Relocated Subclass entitled to damages for breach of contract?

c.      The questions of law and fact common to members of the Obstructed View Class for their claim of breach of contract include the following:  (i) Did the seats for Super Bowl XLV assigned to members of the Obstructed View Class have obstructed views of the playing field and/or Video Replay Board?; (ii) was the furnishing of seats with obstructed views of the playing field and/or Video Replay Board a breach of contract under the ticket contract?; and (iii) are members of the Obstructed View Class entitled to damages for breach of contract?

d.      The questions of law and fact common to members of the Obstructed View Class for their claim of fraudulent inducement include the following:  (i) was the fact that certain seats would have obstructed views of playing field and/or Video Replay Board a material fact?; (ii) did the NFL have a duty to disclose that certain seats would have obstructed views of the playing field and/or Video Replay Board to ticket purchasers?; and (iii) are members of the Obstructed View Class entitled to damages for fraudulent inducement?

5.8    Notice: Notice can be provided via internet publication, published notice and/or through mail and paid for by the NFL.

## VI.    FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (By all Plaintiffs Against the NFL)

6.1    The allegations of paragraphs 1.1 through 5.8 are re-alleged and incorporated herein by reference, and Plaintiffs allege as follows a cause of action on behalf of themselves and the classes of similarly situated ticket holders.

6.2    Tickets to Super Bowl XLV were originally sold to the fans, putative members of the classes and Plaintiffs by the NFL.

6.3    Accordingly, Plaintiffs entered into an agreement with the NFL whereby the NFL sold to Plaintiffs tickets for seats to Super Bowl XLV on February 6, 2011.  These tickets comprise valid and enforceable contracts entitling Plaintiffs to seats at the Super Bowl.

6.4    Plaintiffs fully and properly performed all conditions, covenants, and acts required to be performed on their part in accordance with the terms and conditions of the ticket purchases.

6.5    The NFL breached its obligations under the agreement to the "Displaced Class" by, among other things, failing and refusing to provide any seats to these ticket holders.

6.6    The NFL breached its obligations under the agreement to the "Relocated/Delayed Class" by, among other things, failing to provide the assigned seat purchased by the ticket holder and/or delaying ticket holders in gaining pre-game access to their seats due to the problems with the installation of some of the temporary seats at Cowboys Stadium.

6.7    The NFL breached its obligations under the agreement to the "Obstructed View Class" by, among other things, providing temporary and obstructed view seating without proper disclosure.

6.8    As a direct and proximate result of the NFL's breaches, Plaintiffs have sustained damages including but not limited to the cost of their tickets and travel-related expenses, in a total amount to be determined at trial.

6.9    Plaintiffs accordingly seek relief set forth herein.

## VII.   SECOND CLAIM FOR RELIEF
## FOR FRAUDULENT INDUCEMENT
### (By Plaintiffs Robert Fortune, Dean Hoffman, and Constance Young Against the NFL)

7.1     The allegations of paragraphs 1.1 through 6.9 are re-alleged and incorporated herein by reference, and Plaintiffs Robert Fortune, Dean Hoffman, and Constance Young allege as follows a cause of action on behalf of themselves and members of the Obstructed View Class.

7.2     Plaintiffs purchased and/or acquired tickets for Super Bowl XLV from the NFL. By omitting any reference to obstructed views, consistent with NFL guidelines requiring that seats with obstructed views be disclosed to purchasers, the NFL affirmatively represented that the views of the game and the Video Replay Board from the assigned seats purchased by ticket holders would not be obstructed.

7.3     These omissions were material, as they conveyed to Plaintiffs that their views of the game and the Video Replay Board would not be obstructed.  The NFL had a duty to disclose that certain seats had obstructed views of the game and the Video Replay Board.

7.4     The representations on the tickets were false in that they contained no reference to obstructed views and members of the Obstructed View Class, including Plaintiffs Fortune, Hoffman, and Young, did not receive a spectator seat to actually spectate or view the game and the Video Replay Board; instead, they received seats with obstructed views of the game and the Video Replay Board.

7.5     The NFL knew the tickets were false or made the representations on the tickets and omitted any reference to obstructed views recklessly and without knowledge of their truth, as the NFL, as set forth above, was fully aware prior to the game and at the time of sale, among other things, that:

(a)     the tickets sold to Plaintiffs were for temporary seating;

(b)     the NFL would have to assess or determine whether views of the game and Video Replay Board from these seats would be obstructed and had not done so;

(c)     the seats listed on the tickets sold to Plaintiffs would not have unobstructed views of the field, game, stadium and/or the Video Replay Board; and/or

(d)     the seating plan arrived at by the NFL well prior to the game necessitated that seats have obstructed views of the game, field and/or Video Replay Board.

7.6     The NFL omitted these material facts with the intent that Plaintiffs act on them by purchasing tickets, spending money on travel, lodging, entertainment, and other arrangements to attend Super Bowl XLV, and making necessary arrangements to take time off from work in order to attend Super Bowl XLV.

7.7     Plaintiffs relied on these omissions, and on the basis of these omissions, were induced to, among other things, purchase tickets, make travel plans and other arrangements to attend Super Bowl XLV, and make necessary arrangements to take time off from work in order to attend Super Bowl XLV.

7.8     As a result, Plaintiffs have sustained substantial damages including but not limited to the cost of their tickets, travel-related expenses, loss of vacation time, and other expenses in a total amount exceeding $5,000,000, to be determined according to proof at trial.

7.9     The NFL's conduct as described herein was extreme and outrageous, entitling Plaintiffs to punitive damages.


### XIII.   CONDITIONS PRECEDENT

8.1     All conditions proceeding to Plaintiffs' claims for relief have been performed or have occurred.


### IX.   DAMAGES AND RELIEF SOUGHT

9.1     Plaintiffs hereby incorporate paragraphs 1.1 through 8.1, verbatim, as set forth at this point.

9.2     Plaintiffs seek to recover actual damages outlined below from the NFL as a direct and proximate result of the unlawful conduct of the NFL.

9.3     Plaintiffs will show that the conduct of the NFL constitutes "gross negligence," "malice," and "actual malice" under Texas law. Accordingly, Plaintiffs request the assessment of exemplary or punitive damages in an amount as may be necessary to punish the NFL and to deter others with similar lawless inclinations in the future.

14.4    For Plaintiffs' First Claim for Relief for Breach of Contract, Plaintiffs seek to recover the following damages and obtain the following relief from the NFL:

      (a)     Economic loss suffered by Plaintiffs;

      (b)     All reasonable and necessary attorneys' fees;

      (c)     Court costs; and

      (d)     Pre and post-judgment interest.

14.5    For Plaintiffs' Second Claim for Relief for Fraudulent Inducement, Plaintiffs seek to recover the following damages and obtain the following relief from the NFL:

      (a)     Economic loss suffered by Plaintiffs;

      (b)     Punitive Damages

      (c)     All reasonable and necessary attorneys' fees;

      (d)     Court costs; and

      (e)     Pre and post-judgment interest.

## X.     PRAYER

WHEREAS, PREMISES CONSIDERED, Plaintiffs pray the NFL be cited in terms of law to answer herein and that upon final trial, Plaintiffs have and recover all damages which they are entitled, all costs of Court, attorneys' fees, pre and post-judgment interest, and for further and other relief, whether in law or in equity, to which Plaintiffs may show themselves justly entitled.


DATED:  February 28, 2013         _____
                           s/ Michael J. Avenatti
                           Michael J. Avenatti (*Pro Hac Vice*)
                           Bar Number:  206929
                           Jason M. Frank (*Pro Hac Vice*)
                           Bar Number:  190957
                           Ahmed I. Ibrahim (*Pro Hac Vice*)

Bar Number: 238739
EAGAN AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
E-Mail:        mavenatti@eaganavenatti.com
               jfrank@eaganavenatti.com
               aibrahim@eaganavenatti.com
Telephone:    949-706-7000
Facsimile:    949-706-7050

and

      s/ Christopher S. Ayres
Christopher S. Ayres
Texas Bar No. 24036167
R. Jack Ayres, Jr.
Texas Bar No. 01473000
LAW OFFICES OF R. JACK AYRES, JR., P.C.
4350 Beltway Drive
Addison, Texas 75001
E-Mail:        csayres@ayreslawoffice.com
Telephone:    972-991-2222
Facsimile:    972-386-0091


## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial of all causes by jury.


DATED:  February 28, 2013      s/ Michael J. Avenatti
      Michael J. Avenatti (*Pro Hac Vice*)
      Bar Number: 206929
      Jason M. Frank (*Pro Hac Vice*)
      Bar Number: 190957
      Ahmed I. Ibrahim (*Pro Hac Vice*)
      Bar Number: 238739
      EAGAN AVENATTI, LLP
      450 Newport Center Drive, Second Floor
      Newport Beach, CA 92660
      E-Mail:        mavenatti@eaganavenatti.com
                     jfrank@eaganavenatti.com
                     aibrahim@eaganavenatti.com
      Telephone:    949-706-7000
      Facsimile:    949-706-7050

      and


      s/ Christopher S. Ayres
      Christopher S. Ayres
      Texas Bar No. 24036167
      R. Jack Ayres, Jr.

Texas Bar No. 01473000
LAW OFFICES OF R. JACK AYRES, JR., P.C.
4350 Beltway Drive
Addison, Texas 75001
E-Mail:       csayres@ayreslawoffice.com
Telephone:   972-991-2222
Facsimile:    972-386-0091

# Exhibit A



## INVOICE
### COWBOYS STADIUM, LP
### SUPER BOWL XLV
One Legends Way
Arlington, TX 76011

| TQTY | SECTION | ROW | SEATS | TOTAL COST |
|---|---|---|---|---|
| | | | | $2,400.00 |

### BILLING SUMMARY

| | |
|---|---|
| Tickets | $2,400.00 |
| Shipping & Handling Fees | $30.00 |
| Less Credits/Payments | $0.00 |
| TOTAL AMOUNT DUE | $2,430.00 |

Deadline for payment: January 14, 2011

Please return this portion with your check payment.
### SUPER BOWL XLV INVOICE

### BILLING SUMMARY

AMOUNT DUE        $2,430.00
Deadline for payment: January 14, 2011

### METHODS OF PAYMENT

**Check/Money Order**
Please make checks payable to:

DALLAS COWBOYS
One Legends Way
Arlington, TX 76011

**Credit Card**
☐ Mastercard   ☐ Visa   ☐ Discover   ☐ American Express
Name: _____
Card #: _____
Expiration Date: _____

REDACTED

EXHIBIT A



# INVOICE
## COWBOYS STADIUM, LP
### SUPER BOWL XLV
One Legends Way
Arlington, TX 76011

| TQTY | EVENT | TOTAL COST |
|------|-------|-----------|
| 1 | Super Bowl XLV Parking | $60.00 |

### BILLING SUMMARY

| | |
|---|---|
| Parking | $60.00 |
| Less Credits/Payments | $0.00 |
| TOTAL AMOUNT DUE | $60.00 |
| Deadline for payment:  January 21, 2011 | |

Please return this portion with your check payment.
## SUPER BOWL XLV INVOICE

### BILLING SUMMARY

AMOUNT DUE          $60.00
Deadline for payment:  January 21, 2011

### METHODS OF PAYMENT

**Check/Money Order**
Please make checks payable to:

DALLAS COWBOYS
One Legends Way
Arlington, TX 76011

**Credit Card**

☐ Mastercard   ☐ Visa   ☐ Discover   ☐ American Express

Name: _____

Card #: _____

Expiration Date: _____

REDACTED

# Exhibit B

## EXHIBIT C - OBSTRUCTED VIEW CLASS

Estimated Total Number of Obstructed View Class Members

### SILVER LEVEL OBSTRUCTED VIEW SEATS

| Section | Row | Seat Numbers | Number of Seats | Document Reference |
|---------|-----|--------------|-----------------|--------------------|
| 321A | 16 | 6-9, 13-22 | 14 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 321A | 17-20 | 6-22 | 68 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 321A | 21 | 6-23 | 18 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 321A | 22-30 | 1-3 | 27 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 321A | 22-30 | 7-23 | 153 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 321A | 31 | 1-23 | 23 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 322A | 16 | 6-9, 13-22 | 11 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 322A | 17-20 | 6-19 | 56 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 322A | 21-31 | 5-19 | 165 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 323A | 21-31 | 4-18 | 165 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 324A | 16 | 3-9, 13-16 | 11 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 324A | 17-20 | 3-16 | 56 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 324A | 21-31 | 3-17 | 165 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 325A | 16 | 3-12, 16-19 | 14 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 325A | 17-20 | 3-19 | 68 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 325A | 21 | 2-19 | 18 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 325A | 22-30 | 2-18, 22-24 | 180 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 37 (NFL-011775, 11779) |
| 345A | 16 | 6-9, 13-22 | 14 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 345A | 17-18 | 6-22 | 34 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 345A | 19-21 | 6-23 | 54 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 345A | 17-30 | 1-3 | 42 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 345A | 17-30 | 7-23 | 238 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 345A | 31 | 1-24 | 24 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 346A | 16 | 6-9, 13-22 | 14 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 346A | 17-18 | 6-19 | 28 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 346A | 19-30 | 5-19 | 180 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 346A | 31 | 1-21 | 21 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 347A | 21-30 | 4-18 | 150 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 347A | 31 | 1-21 | 21 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 348A | 16 | 3-9, 13-16 | 11 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 348A | 17-18 | 3-16 | 28 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 348A | 19-30 | 3-17 | 180 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 348A | 31 | 1-21 | 21 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 349A | 16 | 3-12, 16-19 | 40 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 349A | 17-18 | 3-19 | 34 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |

EXHIBIT B

| | | | | |
|---|---|---|---|---|
| 349A | 19-21 | 2-19 | 54 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 349A | 21-30 | 2-18 | 170 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 349A | 21-30 | 22-24 | 30 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |
| 349A | 31 | 1-24 | 24 | Appx., Ex. 36 (NFL-011296-11297); Ex. 35 (NFL-011300); Ex. 64 (NFL-012594-12600); Weissman Affid.; Sylvester Affid.; Matesic Affid. |

SUBTOTAL – SILVER LEVEL        2,624

MAIN CONCOURSE LEVEL OBSTRUCTED VIEW SEATS

| Section | Row | Seat Numbers | Number of Seats | Document Reference |
|---|---|---|---|---|
| 201A | All | All | 89 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 66 (NFL-012601-12608); Ex. 44 (NFL-011732-011733); Dar Affid. |
| 202A | All | All | 66 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 66 (NFL-012601-12608); Ex. 44 (NFL-011732-011733) |
| 203A | All | All | 60 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 66 (NFL-012601-12608); Ex. 44 (NFL-011732-011733) |
| 204A | All | All | 59 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 66 (NFL-012601-12608); Ex. 44 (NFL-011732-011733) |
| C207A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326); Polacheck Affid. |
| C208A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326) |
| C209A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326) |
| C211A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326) |
| C212A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326) |
| C213A | All | All | 72 | Appx., Ex. 68 (NFL-012617-12623); Ex. 30 (NFL-011325-11326) |
| 216A | All | All | 59 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 67 (NFL-012609-12616) |
| 217A | All | All | 60 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 67 (NFL-012609-12616) |
| 218A | All | All | 66 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 67 (NFL-012609-12616); Ex. 44 (NFL-011732-011733); Hoffman Affid. |
| 219A | All | All | 89 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 67 (NFL-012609-12616); Ex. 44 (NFL-011732-011733) |
| 220A | 36-44 | All | 186 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 57 (NFL-012551-12557); Exs. 36, 35 (NFL-011296-11297, 11300) |
| 221A | 36-44 | All | 139 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 57 (NFL-012551-12557); Exs. 36, 35 (NFL-011296-11297, 11300) |
| 222A | 36-44 | All | 132 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 57 (NFL-012551-12557) |
| 223A | 36-44 | All | 139 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 57 (NFL-012551-12557); Ex. 36, 35 (NFL-011296-11297, 11300) |
| 224A | 36-44 | All | 178 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 57 (NFL-012551-12557); Ex. 36, 35 (NFL-011296-11297, 11300) |
| 226A | All | All | 89 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 70 (NFL-012625-12632); Ex. 44 (NFL-011732-011733); Wagner Affid. |
| 227A | All | All | 66 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 70 (NFL-012625-12632); Ex. 44 (NFL-011732-011733) |
| 228A | All | All | 62 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 70 (NFL-012625-12632); Ex. 44 (NFL-011732-011733) |
| 229A | All | All | 59 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 70 (NFL-012625-12632); Ex. 44 (NFL-011732-011733) |
| 241A | All | All | 56 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 71 (NFL-012633-12640); Fortine Affid. |
| 242A | All | All | 60 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 71 (NFL-012633-12640) |
| 243A | All | All | 66 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 71 (NFL-012633-12640); Ex. 44 (NFL-011732-011733) |
| 244A | All | All | 79 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 71 (NFL-012633-12640); Ex. 44 (NFL-011732-011733) |
| 245A | 36-45 | All | 190 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 58 (NFL-012558-12564); Ex. 36, 35 (NFL-011296-11297, 11300) |
| 246A | 36-45 | All | 138 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 58 (NFL-012558-12564); Ex. 36, 35 (NFL-011296-11297, 11300) |
| 247A | 36-45 | All | 132 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 58 (NFL-012558-12564) |
| 248A | 36-45 | All | 134 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 58 (NFL-012558-12564); Ex. 36, 35 (NFL-011296-11297, 11300); Melara Affid. |

| | | | | |
|---|---|---|---|---|
| 249A | 36-45 | All | 182 | Appx., Ex. 83 (NFL Resp. to Interrogatory No. 13); Ex. 58 (NFL-012558-12564); Ex. 36, 35 (NFL-011296-11297, 11300) |

SUBTOTAL – MAIN CONCOURSE LEVEL     3067

UPPER CONCOURSE LEVEL OBSTRUCTED VIEW SEATS BEHIND PEPSI SIGN

| Section | Row | Seat Numbers | Number of Seats | Document Reference |
|---|---|---|---|---|
| 426A | 21-30 | 1-18 | 180 | Appx., Ex. 59 (NFL-012565-12572); Ex. 50 (NFL-011723); Ex. 45 (NFL-011220-11221); Ex. 23 (STG000028-29, 41); Young Affid.; Bresemen Affid. |
| 427A | 33 | 1-21 | 21 | Appx., Ex. 59 (NFL-012565-12572); Ex. 50 (NFL-011723); Ex. 45 (NFL-011220-11221); Ex. 23 (STG000028-29, 41); Young Affid.; Bresemen Affid. |
| 427A | 21-33 | 1-24 | 312 | Appx., Ex. 59 (NFL-012565-12572); Ex. 50 (NFL-011723); Ex. 45 (NFL-011220-11221); Ex. 23 (STG000028-29, 41); Young Affid.; Bresemen Affid. |

SUBTOTAL – UPPER CONCOURSE LEVEL     513

TOTAL ESTIMATED OBSTRUCTED VIEW
SEATS IN CLASS     | 6204 |

## CERTIFICATE OF SERVICE

On February 28, 2013, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal rule of Civil Procedure 5 (b)(2).

DATED:  February 28, 2013

s/ Michael J. Avenatti
Michael J. Avenatti (*Pro Hac Vice*)
Bar Number:  206929
Jason M. Frank (*Pro Hac Vice*)
Bar Number:  190957
Ahmed I. Ibrahim (*Pro Hac Vice*)
Bar Number:  238739
EAGAN AVENATTI, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
E-Mail:      mavenatti@eaganavenatti.com
             jfrank@eaganavenatti.com
             aibrahim@eaganavenatti.com
Telephone:  949-706-7000
Facsimile:   949-706-7050

and

s/ Christopher S. Ayres
Christopher S. Ayres
Texas Bar No. 24036167
R. Jack Ayres, Jr.
Texas Bar No. 01473000
LAW OFFICES OF R. JACK AYRES, JR., P.C.
4350 Beltway Drive
Addison, Texas 75001
E-Mail:      csayres@ayreslawoffice.com
Telephone:  972-991-2222
Facsimile:   972-386-0091