**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| STEVE SIMMS, BRUCE IBE, WES LEWIS, CONSTANCE YOUNG, ROBERT FORTUNE, and DEAN HOFFMANN, *Individually and on Behalf of All Others Similarly Situated*, | § § § § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. 3:11-CV-0248-M |
| v. | § § | (Consolidated with 3:11-CV-345-M) |
| JERRAL "JERRY" WAYNE JONES, BLUE & SILVER INC., DALLAS COWBOYS FOOTBALL CLUB, LTD., JWJ CORPORATION, COWBOYS STADIUM, L.P., COWBOYS STADIUM, G.P., LLC, and NATIONAL FOOTBALL LEAGUE, | § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Class Certification [Docket Entry #133]. The Court held a hearing on this Motion on June 5, 2013. For the reasons explained below, the Motion for Class Certification is **DENIED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs in this case were ticketholders for Super Bowl XLV held at Cowboys Stadium on February 6, 2011. They bring claims for breach of contract; one proposed sub-class also brings a claim for fraudulent inducement. Pls. Consol. Second Am. Compl. at ¶ 6.1-7.9 [Docket Entry # 182]. These claims arise from events transpiring before and during that Super Bowl game.

The Super Bowl XLV tickets are form contracts granting holders "entry in the stadium and a spectator seat for the game." Pls. App. p. 16. The Ticket Terms printed on the back of the

ticket further read that "[a]dmission may be refunded or ticket holder ejected at the sole discretion of the National Football League, subject to refund....THE DATE AND TIME OF THE GAME IS SUBJECT TO CHANGE BY THE NFL IN ACCORDANCE WITH ITS SCHEDULING POLICIES OR AS A RESULT OF OTHER ACTIONS OR EVENTS BEYOND THE NFL'S CONTROL. NO REFUND WILL BE PROVIDED IF TICKET HOLDER CANNOT ATTEND." *Id.* (emphasis in original). The front of each ticket includes the face value of the ticket in dollars and alerts the holder that "Stadium Gates Open at 1:00 PM". *Id.* at 15. The base ticket price was $900. Def. App. at 57. Some tickets were actually sold officially for $800 or $1,200, tickets distributed through the NFL's fan lottery were sold for $600 and some tickets marked as "restricted view" were discounted to $600. *Id.* Patrons at Cowboys Stadium have the opportunity to view a video/replay and scoreboard (hereinafter "Video Replay Board"). The Video Replay Board is massive, spanning 60 yards and Plaintiffs claim that viewing it was an important component of the Super Bowl experience during the pregame, halftime and postgame shows. Pls. App. at 330.

To accommodate additional fans at the Super Bowl game, Cowboys Stadium, L.P. contracted with a firm, Seating Solutions, to install 13,000-15,000 temporary seats to supplement the stadium's normal 80,000 seating capacity. Def. App. at 111. Installation began on January 8, 2011, however it did not proceed according to schedule and some seats were still being installed and inspected just hours before the game started on February 6, 2011. *Id.* at 1; Pls. Supp. App. at 77. The installation delays prevented the opening of the stadium gates to all ticketholders at 1:00 p.m., the time stated on the tickets. Def. App. at 2. Instead, the stadium gates were opened at 2:20 p.m. *Id.* All other pre-game entertainment commenced according to the NFL's pre-planned schedule, with player warm-ups at 4:17 p.m., the marching band performance at 4:58 p.m., team

introductions at 5:06 p.m., the Man of the Year Presentation at 5:16 p.m., performances of America the Beautiful and the National Anthem at 5:18 p.m., and the ceremonial coin toss at 5:27 p.m. Def. App. at 24.

Although the game started on schedule, the problems with the temporary seating were never completely resolved. Four groups of ticketholders claim to have been affected by the partial completion of the temporary seating: (1) those who paid for and/or acquired tickets to Super Bowl XLV and were denied seats to the game (the proposed "Displaced Class"); (2) those who were delayed in gaining access to their seats due to delays installing temporary seating (the proposed "Delayed Class"); (3) those who were relocated from their assigned seat as listed on their ticket to other seats of lesser quality in the stadium (the proposed "Relocated Class"); and (4) those who were seated, but had an obstructed view of the field and/or Video Replay Board (the proposed "Obstructed View Class"). The Plaintiffs seek class certification for each of these groups.

Four hundred and thirty-four temporary seats in the Pepsi Deck, at the outside edges of Sections 425A and 430A, were incomplete and had not been approved for use by the time the game started.[1] These seats were at: Section 425A, Row 22, Seats 6-21; Rows 23-32, Seats 4-21; Row 33, Seats 1-21; and Section 430A, Row 22, Seats 13-28; Rows 23-32, Seats 13-30; Row 33, Seats 13-33. Pls. App. at 493. Alternative seats were not available to these ticketholders. Plaintiffs have since expanded their proposed definition of this group, the Displaced Class, to include all persons who purchased and/or acquired a ticket to the game but were denied a seat, even those ticketholders who did not have seats in the above listed sections. Pls. Reply Br. at 17. This amendment expanded class eligibility to ticketholders with seats that would have been

---

[1] The record does not indicate who was responsible for approving temporary seating sections for use.

included in the Delayed or Relocated Classes, *see infra,* but who were turned away as a result of a miscommunication or misunderstanding. Pls. Reply App. at 202-03. The NFL admits that these ticketholders were entitled to, but were denied a seat to the game. *Id*. After the game, the NFL established a voluntary reimbursement program, ultimately allowing members of this Displaced Class to choose one of three options as to each ticket, in exchange for signing releases:

> (1) Payment of $2,400 (three times the face value of the ticket) plus one free, transferable ticket for a non-temporary seat at the next NFL Super Bowl game;

> (2) One free, non-transferable ticket for a non-temporary seat at any future Super Bowl game of the fan's choice, plus round trip airfare and hotel accommodations provided by the NFL; or

> (3) the greater of (i) $5,000 or (ii) an amount equal to the aggregate total of the actual, documented expenses incurred by the ticketholder, including (a) the actual price paid for the Super Bowl XLV game ticket, (b) airfare or other expenses incurred related to travel to/from the Dallas-Ft. Worth area, (c) a per diem for food, tips and ancillary charges at a daily rate of $100 a day for up to five days actually spent in the DFW area, (d) hotel lodging costs for room, internet, parking and tax for up to four nights, (e) ground transportation and parking costs incurred, and (f) expenses for renting a car in the DFW area and gas for up to a maximum of five days rental.

Def. App. at 129-30. Most members of the Displaced Class have accepted one of the three settlement offers. Two have proceeded with their own cases in Pittsburgh. The holders of approximately 40 tickets have unresolved claims. Def. App. at 58; Class Certification Hr'g Tr. 24:18-22, June 5, 2013. The proposed class representatives for the Displaced Class are Bruce Ibe, David Wanta and Ken Laffin.

As a result of the temporary seats issue, the security lines opened at 1:15 p.m., but the stadium gates did not open until 2:20 p.m., and many fans were still denied entry because their sections were not ready to be occupied. Def. App. at 36. The Pepsi Deck seats, Sections 425A through 430A, were not completely installed and approved for use until 3:43 p.m. *Id*. at 2. As a result, tickets for seats in those sections were rejected by scanners in the security lines until

approximately 3:44 p.m. *Id.* at 98. Many of these ticketholders waited for several hours in line only to have their tickets rejected at the security checkpoints. Pls. App. at 19-20.  Others were allegedly forced into a gated enclosure to wait for their seats for several hours, without access to restrooms or drinking fountains. Pls. Reply App. at 71; Hr'g Tr. 93:16-94:16.

Other patrons not assigned to the Pepsi Deck also experienced delays entering the stadium, including ticketholders in Sections 205A, 215A, 230A, and 240A. They were offered replacement seats because the NFL was unable to complete the installation of temporary seats in those sections. The NFL has identified 876 affected seats within those sections. Pls. App. at 526-30.

The NFL customarily retains an inventory of unassigned tickets to be distributed at the last minute or for reallocation purposes in the event that seats are unavailable on game day. Def. App. at 57. While the NFL has a record of which seats were distributed as replacements, it does not have records showing which replacement seat was given to which ticketholder. The replacement seats were scattered in at least 60 different sections of the stadium. Def. App. at 58, 95. In some cases, the quality of the replacement seat was higher than the seat originally purchased, whether measured in terms of the ticket's face value or its comparative position within the stadium relative to the field. Many relocated fans believed their replacement seats were of lesser quality than their original seats and many were separated from their friends and family as a result of their relocations. Pls. App. at 63.

Patrons in 2924 seats were delayed and/or relocated: 2,048 of those were only delayed, while 876 were delayed and relocated. Pls. Br. at 40 (Ex. B). The proposed Delayed Class would be comprised of fans with seats in the Pepsi Deck who eventually reached their seats and fans in Sections 205A, 215A, 230A, and 240A, who were given replacement seats. The proposed class

representatives for the Delayed Class are Constance Young, Rebecca Burgwin and Jason McLear[2]. The Relocated Subclass would be comprised only of the 876 fans in Sections 205A, 215A, 230A, and 240A who were delayed and given replacement seats. The proposed class representatives for the Relocated Subclass are Rebecca Burgwin and Jason McLear.

The NFL made public offers for voluntary reimbursement to ticketholders who were delayed, whether or not relocated, in exchange for releases. The voluntary reimbursement consisted of two options:

> (1) Payment of the face value of the affected Super Bowl XLV game ticket; or
>
> (2) One free, transferable ticket to any future Super Bowl game of the fan's choice.

Def. App. at 144. According to the Plaintiffs, at least 1,423 persons accepted one of the two reimbursement options, leaving up to 1,501 potential class members who were delayed, some of whom were also relocated. Pls. Br. at 40 (Ex. B). The NFL, on the other hand, estimates that as many as 70% of the Delayed Class has signed releases, leaving approximately 880 potential class members. Def. Br. at 9. The NFL admits that for certification purposes this disparity in estimated class size is not material. *Id.* at n. 48.

In addition to the delays, the installation of temporary seating had other impacts on fans throughout the stadium. Many fans complained that their seats had obstructed views of the field and/or the Video Replay Board. The nature of the obstructions varied between affected seats—some views were blocked by railings, support columns or advertisements, and others were so far back in a lower level that the upper level overhang made the seat seem like it was in a cave. Pls.

---

[2] Defendants filed a Motion for Leave to File Supplement Regarding New Plaintiff Jason McLear [Docket Entry # 258] on June 4, 2013. The Court DENIED this Motion at the June 6 hearing, but permitted the parties to argue about Mr. McLear at the hearing.

App. at 27-28, 34-35, 40, 71, 77, 85, 91, 98, 105, 120, 125. It is undisputed that the NFL knew that certain seats within the stadium would have obstructed views. Tickets for seats in Sections 321A-325A and 345A-349A in the Silver Level were marked as "restricted view" and provided by the NFL to the Cowboys in a separate "restricted view allocation", for sale at a discounted price of $600. Def. App. at 69-77. Originally, the Plaintiffs estimated that 6,204 fans experienced obstructed views, including those who bought the 1,458 tickets designated as "restricted view".[3] Pls. Br. at 42-44 (Ex. C). Those marked tickets have since been excluded, leaving approximately 4,746 potential class members within an Obstructed View Class. The proposed class representatives are Constance Young, Dean Hoffman and Robert Fortune.

The Plaintiffs contend that the NFL knew that many, if not all, of these 4,746 seats would have restricted views. They cite to a series of e-mails, dated from a time months before the Super Bowl, between NFL officials, Cowboys Stadium representatives, and Seating Solutions, discussing visibility problems throughout the stadium.[4] Pls. App. at 179-83, 189, 202-03, 207-25, 230-52, 284. Within these emails are references to a sight line analysis, performed by Seating Solutions, which revealed that many end zone seats in the Main Concourse and Silver Level had obstructed views of at least some portions of the field. Pls. App. at 211-25.  However, many of these e-mails clearly refer to the 1,458 seats that were eventually marked as "restricted view". *See e.g.*, *id*. at 182, 207. The event coordinators enacted plans to address some of the

---

[3] The tickets marked as "restricted view" were identified using computer generated sight-line analysis projections and architectural drawings. None of these seats were actually installed at the time the decision to mark them as "restricted view" was made, nor at the time that the tickets were printed. Pls. Supp. App. at 77

[4] These e-mails discuss sight line obstructions to both the field and the Video Replay Board. Pls. App at 179, 235-36 (discussing obstruction of scoreboard), 202 (discussing obstruction of field), 251 (discussing obstruction of both). The e-mails also discussed the seats which were eventually marked as "restricted view" and allocated to the Cowboys, however, the e-mail chain participants worried that Jerry Jones would be unhappy if a third of the Cowboys allocation had restricted views. *Id*. at 182, 207.

obstructions by putting up video monitors in some sections. *Id.* at 238-41. Some seats were removed entirely. Def. App. at 37. The NFL offered no voluntary reimbursement programs for fans claiming to have experienced obstructed views of the field or Video Replay Board.

All four classes seeking certification bring a breach of contract claim against the NFL. The proposed Obstructed View Class also brings a fraudulent inducement claim against the NFL.

On July 19, 2012, the Court entered its Memorandum Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss Consolidated Complaint. [Docket Entry # 89]. The Court held that each Super Bowl XLV ticket constituted a contract between the NFL and the original purchaser (and purchaser's assignees), but that there was no evidence that the ticket created a contract with any of the other defendants. The Court accordingly dismissed with prejudice all breach of contract claims against defendants other than the NFL. Plaintiffs filed a Second Amended Complaint asserting breach of contract and fraudulent inducement claims against the NFL only.

## II. LEGAL STANDARD FOR CLASS CERTIFICATION

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki¸* 442 U.S. 682, 700–01 (1979). Federal Rule of Civil Procedure 23 governs whether a proposed class falls within this limited exception. "The party seeking certification bears the burden of proof" that the proposed class meets all requirements. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). To meet this burden, the proponent must show that the class satisfies all the requirements in fact; this is not a "mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

Although district courts enjoy discretion to certify a class, class certification is only appropriate if the Court is satisfied, after conducting a rigorous analysis, that the party seeking certification has met its burden of demonstrating that (1) the proposed class meets all four prerequisites of a class action laid out in Rule 23(a), and (2) that the action is maintainable under one of the three categories set forth in Rule 23(b). *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012)*; In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007). Additionally, the Court must consider general prerequisites to certification such as whether the proposed class definitions are appropriate, whether the named representatives are members of the class and whether they have standing. *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S. Ct. 1891, 1896 (1977) ("[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members."); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004) ("Defendants contend that class members cannot be readily identified by way of the class definition. A precise class definition is necessary to identify properly 'those entitled to relief, those bound by the judgment, and those entitled to notice'") (citing 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21[6], at 23–62.2 (3d ed. 2003); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry.").

When conducting this rigorous analysis, the Court must be mindful of the practicalities of trying the particular case as a class action. *See Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) ("We hold that the district court abused its discretion by failing to afford its predominance determination the "rigorous analysis" that Rule 23 requires…. The district court did not meaningfully consider how Plaintiffs' claims would be tried…."); *Castano*, 84 F.3d

at 740 (finding that district court erred in failing to consider how a trial on the merits would be conducted). This necessitates an "understanding of the relevant claims, defenses, facts, and substantive law presented in the case," and "often entail[s] some overlap with the merits of the plaintiff's underlying claim." *Wal–Mart Stores,* 131 S. Ct. at 2551-2552. Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage" and merits questions may be considered only to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–195 (2013).

### A. Rule 23(a) - Class Action Prerequisites

#### i. Numerosity

Certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "A plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981). Nevertheless, there is no magic number at which the numerosity requirement is satisfied. *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013); 7A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1762 (3d ed. 2005) (identifying cases in which numerosity was satisfied with as few as 25 putative class members, but not satisfied with as many as 350). The critical inquiry is not, therefore, whether there are a sufficient number of class members, but whether joinder is impracticable. To make this determination, courts turn to several factors, including "size of the class, ease of identifying members and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).

### ii. Commonality

There must also be "questions of law or fact common to the class". FED. R. CIV. P. 23(a)(2). To meet this burden, the class proponent must demonstrate that "all [of the class members'] claims can productively be litigated at once." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012). It "does not require complete identity of legal claims among the class members"—only that they have "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). Dissimilarities among class members should be considered to determine whether a common question is truly presented. *Wal-Mart Stores*, 131 S. Ct. at 2556.  Nevertheless, the threshold for commonality is not high. *Jenkins v. Raymark Industries*, 782 F.2d 468, 472 (5th Cir. 1986). Even a single common question of law or fact can suffice. *Wal-Mart Stores*, 131 S. Ct. at 2256.

### iii. Typicality

"[T]he claims or defenses of the representative parties [must also be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The test for typicality is not extremely rigorous and does not require that the representative's claims be identical to those of all members of the class. *See Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *Philips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981). The typicality inquiry rests "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims." *Jenkins*, 782 F.2d at 472. "Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat

typicality." *James v. City of Dallas*, *Tex.*, 254 F.3d 551, 571 (5th Cir. 2001) (citing 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000).

     *iv. Adequacy*

     Finally, to comply with the requirements of Rule 23(a), the movant must show that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To meet this requirement, the plaintiffs must be able to show that the "class representatives…possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001). Additionally, the standard for adequacy requires an "inquiry into [1] the zeal and competence of the representative[s]' counsel... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation to protect the interests of absentees" and, [3] the existence of any conflicts of interests between the named plaintiffs and the class they seek to represent. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005). Differences between the named plaintiffs and class members do not render the named plaintiff inadequate unless those differences create actual and material conflicts of interest. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999).

     **B. Rule 23(b)(3)**

     Once the class proponent has satisfied the Rule 23(a) requirements, the class may only be maintained if it falls within one of the three categories of Rule 23(b). Here, the Plaintiffs seek class certification under Rule 23(b)(3), which permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

*i. Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry is far more demanding than the Rule 23(a)(2) commonality inquiry. *Funeral Consumers Alliance*, 695 F.3d at 348-49.   "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). The Court must "assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'" *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). Proponents of certification are not required to show that all issues are common to the class or even that there are more common issues than not; the inquiry is qualitative and pragmatic with an eye toward ascertaining the most pivotal issues. 2 NEWBERG ON CLASS ACTIONS § 4:51 (5th ed.).

Frequently, the courts encounter proposed classes with significant common issues, but which necessarily require individualized considerations on damages. The Fifth Circuit has held that "differences among the members [of a class] as to the amount of damages incurred does not mean that a class action would be inappropriate." *Bell Atlantic Corp. V. AT&T Corp.*, 339 F.3d 294, 307 n. 17 (5th Cir. 2003). Class certification has been upheld where "virtually every issue prior to damages [was] a common issue...[and where e]very aspect of liability in the case" involved a common issue. *Bertulli*, 242 F.3d at 298. In such instances, the Court is permitted to certify a class as to certain issues only, or to bifurcate the trial. *See* FED. R. CIV. P. 23(c) ("When

appropriate, an action may be brought or maintained as a class action with respect to particular issues."); *Mullen*, 185 F.3d 620 (upholding certification with bifurcated trial plan with first phase to adjudicate common issues of liability in aggregate and with second phase to consist of mini-trials on causation, contributory negligence and damages).[5] Nevertheless, partial class certification may not be appropriate where damages must be calculated independently for each class member without reference to a common formula. *See e.g.*, *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) ("[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class."); *Bell Atlantic Corp.*, 339 F.3d at 307 ("[W]here the issue of damages 'does not lend itself to ... mechanical calculation, but requires ''separate mini-trial[s]' of an overwhelmingly large number of individual claims,' the need to calculate individual damages will defeat predominance.").

---

[5] The First, Second, Third, and Sixth Circuits have held that a class may be certified solely on the basis of common liability, with individualized damages determinations to be left to subsequent proceedings. *See e.g., In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6, 28 (1st Cir. 2008) ("[T]he class action can be limited to the question of liability, leaving damages for later individualized determinations."); *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 141 (2d Cir. 2001); *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004) ("'If for any reason the district court were to conclude that there would be problems involved in proving damages which would outweigh the advantages of class certification, it should give appropriate consideration to certification of a class limited to the determination of liability.'") (internal citations omitted); *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) ("As the district court properly noted, it can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method."). The Second Circuit, in the case of *In re Visa Check*, provides a list of possible management tools for district courts to address individualized damages that arise in a class action, including: "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *In re Visa Check*, 280 F.3d at 141.

*ii. Superiority*

Finally, before certifying a class, the Court must conclude that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). To accomplish this, the Court must compare and "assess the relative advantages of alternative procedures for handling the total controversy." *In re TWL Corp.*, 712 F.3d at 896 (quoting FED. R. CIV. P 23(b)(3) Advisory Committee's Note to 1966 Amendment). Superiority analysis is fact-specific and varies depending on the circumstances of each case. *Id.*; 7AA WRIGHT, MILLER, & KANE, FEDERAL PRACTICE & PROCEDURE § 1783, at 322 (3d ed. 2005).

Among the factors for the Court to consider are "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." FED. R. CIV. P. 23(b)(3); *Amchem Products, Inc.*, 521 U.S. at 615–616 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria").

## III. ANALYSIS

Plaintiffs seek certification of four classes of Super Bowl XLV ticketholders who experienced problems on the day of the game. When class certification is sought for multiple subclasses, each individual subclass is treated as its own class and must meet the requirements of Rule 23. *See* FED. R. CIV. P. 23(c)(5).

### A. Displaced Class

The Plaintiffs define the Displaced Class as consisting "of all persons who paid for and/or acquired tickets to Super Bowl XLV and were denied seats to the game." Pls. Reply Br. at 17.

Turning first to the requirements of Rule 23(a), the Court finds that Plaintiffs have failed to show that the proposed Displaced Class satisfies the numerosity requirement. Taking account of those who accepted the NFL's voluntary reimbursement program and furnished releases, a maximum of 40 potential class members remain. Plaintiffs ask the Court, in evaluating numerosity, to consider the total number of class members at the time of their original Complaint, as opposed to those now remaining at the certification stage, because the certification inquiry relates back to the time of suit. *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 920-21 (5th Cir. 2008). The Court agrees that such an approach is appropriate for resolving issues of standing and mootness in a class action context, but this Court cannot conclude that *Sandoz* relates Rule 23(a) inquiries back to the date of the Complaint. To import such a meaning would contravene the proponent's burden to establish that the Rule 23(a) requirements are met at the time when certification is being considered; this burden is higher than a "mere pleading standard." *Wal–Mart Stores*, 131 S. Ct. at 2551. The Court thus restricts the proposed class definition to only those ticketholders who have not settled or otherwise resolved their claims against the NFL. *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.")

Even with this restricted class, comprised of at most forty persons, Plaintiffs argue that they have established numerosity because other classes have been certified with a similar number of plaintiffs. *See e.g.*, *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (finding numerosity satisfied by class of 48 members). Other than pointing to the numbers alone, Plaintiffs have not presented any evidence relevant to the fundamental inquiry: is joinder impracticable? While there is no minimum number of class members necessary to certify a class,

the Court is unconvinced that it would not be possible to join those displaced ticketholders, who are not parties already and who number, at most, 40. Plaintiffs also ask the Court to consider the geographic diversity of the remaining parties, but they produced no evidence to show that there is significant geographic diversity among proposed class members or that their diversity effectively precludes joinder. *See Wal–Mart Stores, Inc.* 131 S. Ct. at 2551.

Even if the proposed Displaced Class met the Rule 23(a) requirements, the Court cannot certify the class under Rule 23(b)(3). To succeed on a breach of contract claim under Texas law, a plaintiff must show "(1) the existence of a valid contract; (2) performance or tentative performance by plaintiff; (3) beach of the contract by defendant; and (4) damage resulting to the plaintiff from the breach." *Stewart v. Sanmina Texas, L.P.*, 156 S.W.3d 198, 214 (Tex. App.— Dallas 2005, no pet.). The NFL admits that it breached the contract formed by the ticket when it did not provide a seat to the displaced ticketholders. Pls. App. at 493; Hr'g Tr. 10:13-16. Only one legal question as to liability remains: whether the ticket terms require the NFL only to refund to displaced ticketholders the face value of the ticket or whether such fans are entitled to the full range of damages generally permitted under contract law. Hr'g Tr. 10:18-11:1. This is a question common to all Displaced Class members.[6] Only one question of fact remains: damages.

---

[6] Resolution of this issue through individual trials will not necessarily pose significant burdens on Plaintiffs or the judiciary. Non-mutual, offensive collateral estoppel will likely enable other individuals, not joined in this action, to argue for the benefit of a ruling against the NFL. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979) (Offensive use of collateral estoppel where a "plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff"). In *Parklane*, the Court held that "trial courts [have] broad discretion to determine when [offensive collateral estoppel] should be applied." *Id*. at 331. The Court noted that among the factors for the court to consider are the ease of joining all plaintiffs in one action and prejudice to the defendant. This case presents an ideal candidate for the use of the doctrine: although joinder is not impossible, the legal implications of the ticket language apply equally to all tickets; therefore, the NFL's interests are identical vis-à-vis all ticketholders. In other words, the NFL's interests in defending itself on this issue will not vary based on a particular plaintiff. If the NFL were to lose on this issue, it would not be unfair to hold it to that ruling as to subsequent plaintiffs.

However, given that patrons incurred vastly different expenses to attend the Super Bowl, there is no formula to adjudicate damages on a class-wide basis. Instead, damages must be resolved individually, with each of the remaining class members presenting evidence or testimony to support their claimed expenses. If the Court were to certify the class, the trial on the merits would devolve into 40 mini-trials solely to determine damages. It is, therefore, clear that individual damages issues predominate over the one remaining common legal issue. *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 744-45 (5th Cir. 2003) ("Where the plaintiffs' damage claims 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,' the potential exists that the class action may 'degenerate in practice into multiple lawsuits separately tried,' In such cases, class certification is inappropriate.") (internal citations omitted).

The Court finds that the plaintiffs have failed to meet their burden to show that "the class is so numerous that joinder of all members is impracticable" as required under Rule 23(a)(1) and that Rule 23(b)(3)'s requirement that common issues predominate over individual issues has not been met. Accordingly, the Court **DENIES** the Motion for Class Certification as to the Displaced Class. The Court finds it unnecessary to consider whether the Displaced Class satisfies the other requirements of Rule 23, the arguments raised by the NFL contesting the membership of two of the named class representatives within the proposed class, or issues of standing and mootness.

### B. Delayed Class

Plaintiffs moved for certification of a Delayed/Relocated Class comprised of a Delayed Class with a Relocated Subclass.[7] Plaintiffs seek certification of the Delayed Class under the following definition: "All persons who were delayed in gaining access to their seats because the

---

[7] The initial "Relocated Subclass" brought a breach of contract claim based on ticket quality and not delays. The Court finds it appropriate to treat this group as its own class. *See infra* Part III.C. In this section the Court only addresses the claims brought by the Delayed Class.

seats were not ready by the time the gates of Cowboys Stadium opened at 1:00 p.m. on game day as promised on the tickets. This subclass consists of all persons who paid for and/or acquired tickets to Super Bowl XLV for [seats in Sections 205A, 215A, 230A, 240A, 426A, 427A, 428A and 429A – all rows and all seats; Section 425A - Row 11, Seats 22-33; Rows 12-18, Seats 22-31; Rows 19-32, Row 33, Seats 22-36; Section 430A, Row 11, Seats 1-12; Rows 12-18; Rows 19-33.]" Pls. Br. at 13.

Although all ticketholders in these sections were delayed, there are two different explanations for the delays allegedly experienced by class members. Some claim they were denied access to the stadium when they wished to enter because their seats were not ready, but others were delayed getting to their seats, after admission to the stadium, because they had to obtain tickets for and move to replacement seats. As these causes of delay are significantly different, the Court finds it necessary to treat the two classes separately and accordingly splits the analysis of this class into two subclasses: an Entry Delayed Subclass and a Relocation Delayed Subclass.

The Entry Delayed Subclass includes only those class members who were delayed as a result of being initially denied entrance to the stadium. In response to concerns that this class definition would include ticketholders who intentionally sought to enter the stadium late, Plaintiffs agreed to amend the class definition to include only those people who presented a ticket for entry into the stadium before 3:44 p.m. Hr'g Tr. 77:9-24. This proposed class thus includes ticketholders in the designated sections, who were delayed getting to their seats due to delay in entering the stadium, but who attempted to enter by 3:43 p.m. The Relocation Delayed Subclass includes only those members who were delayed due to securing replacement seating.

Persons who experienced both entrance and relocation delays will be members of both proposed classes.

As with the Displaced Class, the Court will read in an exclusion of all persons who accepted a voluntary reimbursement offer from the NFL or who have otherwise resolved their claims against Defendants. The sole class representative of the Entry Delayed Subclass is Constance Young. The class representatives for the Relocation Delayed Subclass are Rebecca Burgwin and Jason McLear.

### i. Rule 23(a) Prerequisites

The Defendants do not challenge either the Entry Delayed Subclass or the Relocation Delayed Subclass on numerosity, commonality or typicality. Fed. R. Civ. P. 23(a)(1)-(3). The Court agrees that these prerequisites to certification are met for this proposed class. The Defendants do, however, challenge the adequacy of the named class representatives and Plaintiffs' counsel under Rule 23(a)(4). Adequacy may not be presumed. *Berger*, 257 F.3d at 481 ("Adequacy [under Rule 23] is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy."). After reviewing the evidence of the proposed named representatives' involvement in the case thus far, the Court is satisfied that the named representatives possess the knowledge and ability to control and prosecute this case. The Court recognizes that little has been required of the named representatives up to this point, but the Court finds their willingness to travel to depositions, answer interrogatories and produce documents, and the balance of Plaintiffs' proof, demonstrates that they are adequate under Rule 23(a)(4). *See* Pls. Reply App. at 259-77. Further, the Court concludes that there are no conflicts of interest between the named representatives and the potential class members.   As for class

counsel, the Court concludes that they are qualified, experienced and quite able to conduct this litigation. Thus, Rule 23(a)'s requirements are met for this class.

### ii. Rule 23(b)(3) Requirements

To address predominance and superiority, the Court must evaluate the common issues within the framework of the Plaintiffs' breach of contract claims. To prevail on a breach of contract claim under Texas law, a plaintiff must show "(1) the existence of a valid contract; (2) performance or tentative performance by plaintiff; (3) beach of the contract by defendant; and (4) damage resulting to the plaintiff from the breach." *Stewart v. Sanmina Texas, L.P.*, 156 S.W.3d 198, 214 (Tex. App.—Dallas 2005, no pet.).

### a. Entry Delayed Subclass

The first two elements of the Entry Delayed Subclass's breach of contract claims are met. There is no dispute that the Super Bowl ticket was a contract between the NFL and the ticket purchaser. As the language on the ticket is standard and applies equally to all ticketholders, the meaning and obligations under the ticket are common to all potential class members, particularly the issue of whether the ticket created an obligation on the NFL to open the stadium gates at 1:00 p.m., and whether the ticket guaranteed access to any or all pre-game field activities and entertainment. By limiting the class to those ticketholders who attempted to enter the stadium but were denied entry, the second element of contract performance by the claimant is likely to be globally satisfied by that class definition.

This class essentially has two breaches of contract claims. First, the Entry Delayed Subclass claims a breach because the NFL did not open the stadium gates at 1:00 p.m. As a result of this delayed entry, they claim a second breach, that they were denied access to their seats for part or all of the pre-game experience, and for some patrons, portions of the game itself. Some

facts and issues relating to the first breach will be common to all class members. Plaintiffs propose that by delaying entry to the stadium, the NFL committed a *per se* breach, thus alleviating the need to consider the extent of the delay experienced by any member of the class; if Plaintiffs' argument prevails, the effect would be the same for all class members—a breach would be established and they would move forward by proving their damages.[8] However, if the delay was not a *per se* breach, a jury would need to determine if the delay was merely a non-actionable inconvenience, a partial breach of the contract's terms, or a material breach. The degree of breach is critical for calculating allowable damages.

Under Texas law, if a contracting party materially breaches a contract, the non-breaching party is no longer obligated to perform and may seek damages as if the entire contract had been breached. *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Allied Capital Partners, LP v. Proceed Technical Res., Inc.*, 313 S.W.3d 460, 465 (Tex. App.—Dallas 2010). Whether a breach is material depends on many factors, including the extent to which the non-breaching party would be deprived of the benefit he could have reasonably anticipated from full performance; the less the non-breaching party is deprived of the expected benefit under the contract, the less material the breach. *Hernandez*, 975 S.W.2d at 693. The fundamental question of materiality in this case is whether, by delaying admission to the stadium, the NFL breached its contract with ticketholders such that they would no longer have even been obligated to actually attend the game to receive damages.[9] If the breach were partial, however, damages would be limited to those attributable to the breaching conduct. If the duration of the delay alters the

---

[8] At this time, the Court may not resolve the merits of Plaintiff's argument that this is a *per se* breach. The Court must consider class certification as if the alleged breach were *per se* and as if it were not.

[9] This is largely a hypothetical issue, as there is no evidence that any class members actually left the Super Bowl as a result of the delay. For the alleged breach to be material, Plaintiffs need not show that they actually left; they only have to show that the breach was so offensive to the intention of the contract that they could have left without forfeiting their right to damages.

existence or extent of the breach, the point at which the delay transforms from an inconvenience to a partial breach to a material breach could also be determined using common evidence of scan data collected by ticket takers at the Super Bowl. This data, in the aggregate, shows the duration of stadium entry delays for all class members; using this data, a common jury could determine whether the delay was a breach at all and could then isolate the point at which the delay was so long that it rendered the NFL's conduct a material breach of the contract.[10]

As for the second breach of contract, that class members were denied access to their seats for part or all of the pre-game activities, and for some patrons, portions of the game itself, the breach cannot be proven with common evidence. Although scan data showing actual entry time for each patron will be helpful, individual fact questions must be resolved. These include whether the ticketholder missed any pre-game activity and if so, what, and whether other independent factors caused additional delays before they reached their seats (i.e., visiting the gift shop, concession stands, or restrooms, before finding their seats or re-attempting to enter the stadium). Such individual inquiries are necessary to determine whether the NFL caused individual class members to miss activities as a result of the entrance delays, or whether individual decisions outside of the NFL's control were the cause.

Further, the calculations of damages that resulted from delayed entry to the stadium as well and from delayed access to seats will require consideration of individual factors other than the times when tickets were scanned, such as which activities were missed and for how long, and in cases of material breach, expenses to attend the game.

---

[10] Conceivably, a jury could determine, for example, that an initial scan at 3:30 p.m. with actual entry at 3:43 p.m. was not a breach at all, while attempted entry at 2:30 p.m. with admission at 3:43 p.m. was a partial breach, while attempted entry at 1:05 p.m. with actual admission at 3:43 p.m. was a material breach.

To recover damages, each class member would need to present evidence or testimony to establish the costs incurred to attend the Super Bowl, which would then need to be considered in light of that person's particular experience, to calculate any loss or damage actually sustained as a result of losing the "benefit-of-the-bargain". *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 147 (Tex. App.—Dallas 2012, no pet.); *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Sci., Inc.,* 128 S.W.3d 304, 317 n. 6 (Tex. App.—Dallas 2004, no pet.) (explaining that the benefit-of-the-bargain measure of damages seeks to restore injured party to economic position it would have been in had contract been performed). Evaluating the award that will put a plaintiff in the same position as if the contract had been performed is especially difficult where the purpose of the contract is to provide something of intangible value, such as entertainment. Texas law permits recovery of monetary losses associated with a breach of contract; parties generally cannot recover for inconvenience or other non-monetary injury. *See Dean v. Dean*, 821 F.2d 279, 281 (5th Cir. 1987) (recognizing that Texas courts generally do not recognize mental anguish damages for breach of contract); *Multi-Moto Corp. v. ITT Commercial Fin. Corp.,* 806 S.W.2d 560, 569 (Tex. App. 1990) (holding that to recover compensatory damages in breach of contract case, plaintiff must prove that he suffered some pecuniary loss); *see Kelly v. Dent Theaters*, 21 S.W.2d 592, 594 (Tex. Civ. App. 1929) (limiting breach of contract damages to amount paid for ticket when ticketholder removed from theatre); c*ompare*, La. Civ. Code Ann. art. 1998 (Louisiana allows for recovery of non-pecuniary damages for breach of contracts intended to gratify a non-pecuniary interest). Nevertheless, the Texas Supreme Court indicated in *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 664 (Tex. 2009), that a plaintiff may claim damages for something intangible like "wasted time" so long as the plaintiff can provide evidence supporting a monetary value for that loss. To the extent that any class

members may claim such damages, any value would be inherently personal and would require individualized inquiries. Caution would be needed to insure that any such damages compensate an actual loss and are not merely a veiled punitive damage award. *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 659 (Tex. 2012) (holding that Texas law does not support punitive damages for breach of contract).

Here, damages associated with the alleged breaches may be recoverable, although nominal. *MBM Fin. Corp*, 292 S.W.3d at 664 (recognizing that Texas allows nominal damage awards for breach of contract where no economic damages are shown). For example, Entry Delayed Subclass members may have waited two hours to be admitted to the stadium after presenting their tickets, but still have made it to their seats without missing any portion of the game or pre-game activities. Such ticketholders may have parked in a more expensive lot, or driven instead of taking a bus, in order to get to the stadium by 1:00 p.m. If the jury determines that the length of delay was a partial breach of contract, but not a material breach, those ticketholders' only damages might be the difference between bus fare and gas or the price of parking in the more expensive lot versus a cheaper lot. If, on the other hand, the jury concludes that the delay was a material breach, those ticketholders may be entitled to collect damages as if the NFL had broken the entire contract, which might include all expenses incurred to attend the game.

In addition to the damage inquiries, which are unique to every class member, there are also individualized liability questions for certain members of the Entry Delayed Subclass who were allegedly required to wait in a fenced-in area for several hours, without access to bathrooms or drinking fountains. Pls. Reply App. at 71; Hr'g Tr. 93:16-94:16. The Plaintiffs, when compiling the scan data, assumed that all tickets without re-scan times belonged to people who

were instructed to wait in these areas until they were let in en masse. Pls. Reply Br. at 5, n. 7. Given that these class members were not just denied admission to the stadium, the degree of any breach associated with their delay may very well be different from these other members of the Delayed Class, and would need to be addressed separately. The proposed Entry Delayed Subclass representative, Constance Young, was not part of this group and cannot represent its unique interests. Pls. App. at 19 (affidavit of Constance Young)

In deciding which issues predominate, the Court conducts a qualitative, and not a quantitative, analysis. 2 NEWBERG ON CLASS ACTIONS § 4:51 (5th ed.). Given that damage calculations will require the most intense and complex inquiries, the Court finds the issue of damages predominates over the common issues surrounding contract interpretation and breach. Further, although there are some common questions that are relatively straightforward, individual issues regarding additional causes and duration of delay threaten to overrun common questions of liability. In this sense, this case is distinguishable from other cases where certification occurred despite individual damages issues. *See e.g.*, *Bertulli*, 242 F.3d at 298 (upholding certification where every aspect of liability involved a common issue); *Mullen*, 185 F.3d 620 (upholding certification in mass tort case where common issues of liability were complex).

This case is more akin to *Steering Committee* and *Bell Atlantic*. In *Steering Committee*, the Fifth Circuit found class certification inappropriate, because damage calculations could not be determined mechanically for plaintiffs who experienced smoke exposure for different periods of time, at different magnitudes of exposure, and who suffered different alleged symptoms. Plaintiffs in the Entry Delayed Subclass experienced different delay lengths, some may have experienced the delay in substantially worse conditions than did others, and all members incurred

different expenses for attending the Super Bowl. That the length of delay, and the attendant assessments of materiality associated with that length of delay, may be determined through electronic scan records does not alter the need for or complexity of individual damage calculations.

In *Bell Atlantic*, the Fifth Circuit held "that where the issue of damages 'does not lend itself to ... mechanical calculation, but requires ''separate mini-trial[s]' of an overwhelmingly large number of individual claims,' the need to calculate individual damages will defeat predominance." 339 F.3d at 307 (internal citations omitted). In *Bell*, the proposed damages formula was rejected for its inability to calculate actual damages suffered. Here, the Plaintiffs have not proposed a true formula, but instead suggest allowing a jury to approve categories of recoverable damages for this breach (i.e. transportation, ticket cost, etc.). In practice, this proposal would require the jury to hear the class representative's claims and decide, based on her case, that to make all members of the class whole, they would award damages equal to, for example, the face value of an individual's ticket plus all transportation expenses, but not the actual price paid for the ticket or food and lodging expenses. Once the class jury isolated "approved categories" of damages, the Plaintiffs argue that individual class members could proceed to prove damages that fell within these categories.

The Court is skeptical that a class-wide approval or disapproval of certain categories of damages would accurately compensate class members for their losses. What makes one person whole may not make others whole. There is a serious risk that disapproving categories of damages allowable for class members could result in under-compensation for actual damages suffered. While such an approach, to the extent that it accurately reflected individual damages, might reduce the length of individual trials by eliminating the ability of class members to pursue

reimbursement of certain expenses, mini-trials for every class member will still be necessary to determine an individual's damages. If this case were partially certified, leaving individualized damage inquiries to later adjudications before a special master or individual juries, or if the Court resolved the common issues and held mini-trials on damages, the problem is still the same: proof of damages will be required for every class member.  Formulaic calculations do not exist, except potentially to limit, accurately or not, class members to damage categories.

The Court thus cannot conclude that a class action is superior to other available methods for adjudicating the controversy. The Court finds that the burdens and costs associated with proceeding as a class action outweigh potential benefits. The damage questions will be more complex than any questions of contract interpretation or common liability, and any judicial economy achieved by class resolution will be minimal. Class counsel for the limited, common issues would need to be compensated, yet individual members may need attorneys to assist in proving damages. Members who have documented expenses may not require assistance of counsel, but those who need to provide testimony to prove their expenses may be unable to do so on their own. The potential need for multiple sets of counsel makes compensation to class counsel a highly complex matter. This would be further complicated if class counsel succeeded on all common elements, but individual counsel could not obtain an award for damages. Given that multiple sets of attorneys may seek payment from the eventual awards, pursuing these claims through a class action may significantly reduce the damage awards to class members.

The Court finds that the common issues do not predominate and the class action is not a superior method for adjudicating the issues for this subclass. Thus, the Court **DENIES** the Motion for Class Certification as to the Entry Delayed Subclass.

b.   Relocation Delayed Subclass

The Relocation Delayed Subclass includes ticketholders who were delayed as a result of being relocated to another seat within the stadium. These ticketholders had seats originally located in Sections 205A, 215A, 230A and 240A—all rows and all seats. Pls. App. at 526. These claimants were able to enter the stadium when the gates were generally opened at 2:20 p.m., but when they arrived at their sections, were instructed to go to Gate F, the ticket resolution center outside of the stadium, to pick up replacement tickets. *Id*. at 62; Pls. Supp. App. at 5; Def. App at 2.

The Relocation Delayed Subclass claims that the process of obtaining and finding replacement seats caused delays and in allowing such delays, the NFL denied them access to their seats for part or all of the pre-game experience, and for some patrons, portions of the game itself, thereby breaching the contract created by the tickets. As with the Entry Delayed Subclass, the existence of a contract and tentative performance by the plaintiff are uncontested.

Here, individualized questions clearly predominate over the questions common to the class. The sole common questions involve the NFL's obligation to provide ticketholders with access to pre-game festivities and field activities under the form ticket's terms. However, the other questions involving breach and damages can be resolved by common evidence. As with delays entering the field, the length of delay experienced in obtaining the replacement seats may be relevant to materiality. However, scan data will not facilitate the resolution of this issue. Although the NFL's scan data will indicate when each ticketholder first entered the stadium, and when the replacement tickets were scanned for entry, without a manifest indicating which original seats were exchanged for which replacement seats, the average delay time cannot be calculated without obtaining evidence from individual class members regarding their two sets of

seats. Therefore, the point at which the delay itself became a breach and further, the point at which that breach became material, cannot be determined using common evidence and must be measured for each class member individually.

If the existence of a breach does not depend on the length of delay, but on the activities missed a result of the delay, this will present only individual questions such as whether the ticketholder missed any pre-game activity and if so, what, and whether other independent factors caused additional delays before they reached their seats. As with the second breach of contract claim brought by the Entry Delayed Subclass, such individual inquiries are necessary to determine whether the NFL caused Relocation Delayed Subclass members to miss activities as a result of the relocation delays, or whether individual decisions outside of the NFL's control were the cause.

Finally, as discussed above with regard to the Entry Delayed Subclass, damages will require individual inquiries because each patron incurred different expenses to attend the game. Other than class-wide approval of damage categories, which the Court finds fallacious, there is not a formula for calculating damages.

The Relocation Delayed Subclass has not established that common issues predominate, therefore the Court DENIES the Motion for Certification as to the Relocation Delayed Subclass.

As both subclasses within the proposed Delayed Class do not meet the predominance requirement under Rule 23(b)(3), the Court DENIES the Motion for Class Certification as to the Delayed Class in its entirety.

### C. Relocated Class

Plaintiffs seek certification of a Relocated Class with the following definition: "All persons who were relocated from their assigned seat as listed on their ticket to other seats in the

stadium of a lesser quality (i.e. higher row and/or lesser yard line). This Subclass consists of all persons who paid for/and or acquired tickets to Super Bowl XLV for one of the following seats within Cowboys Stadium: Sections 205A, 215A, 230A, and 240A – all rows and all seats." Pls. Br. at 13.

Before the Court can evaluate a proposed class under Rule 23, it must consider whether the class membership is ascertainable under the proposed definition. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."). "It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (finding class made up of "residents of this State active in the 'peace movement'" too vague); Although vague and subjective elements within the definition may render a class unascertainable, the Fifth Circuit has explicitly rejected the argument that a so-called "fail-safe class" may not be certified. *See Mullen*, 186 F.3d 620; *Forbush*, 994 F.2d 1101. A "fail-safe class" class is one "whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability.... '[T]he class definition precludes the possibility of an adverse judgment against class members; the class members either win or are not in the class.'...Stated otherwise, the class definition is framed as a legal conclusion." *In re Rodriguez*, 695 F.3d 360, 369-70 (5th Cir. 2012) (internal citations omitted).

By limiting class membership to those who received replacement seats of "lesser quality", the plaintiffs have introduced a subjective element to the class definition. The Court must now determine whether this requirement for class membership creates a permissible "fail-

safe" class or renders the proposed class unascertainable. The Court finds that whether a class member received a "lesser quality" seat goes to both questions of liability and damages, but that it is not so vague that potential class members are unascertainable. As a "fail-safe" class, this definition is sufficient on its face to move on to the Rule 23 inquiry. Nevertheless, the subjective element poses significant impediments to certification under Rule 23.

The Court is satisfied that the Relocated Class meets the requirements of Rule 23(a), but finds that it does not meet the criteria for certification under Rule 23(b)(3).[11] For the breach of contract claim brought by the Relocated Class members, the existence of a contract and performance by the non-breaching party are not in dispute.

The Plaintiffs argue that the issue of liability is also uncontested because "failing to provide the specific assigned seat (irrespective of quality)" is a breach of contract. Pls. Br. at 28 n. 12. The NFL, however, does not concede liability and argues that, like damages, ascertaining liability will require individualized inquiries for two reasons. First, the NFL cannot be liable if the replacement seat was equivalent to or better than the original seat. Given that the class definition limits class members to those who received "lesser quality" seats, this point is moot; none of the proposed class members will have equivalent or better seats. This issue then becomes subsumed into the damages inquiry discussed below. Second, the NFL argues that it could only

---

[11] The Court does find that all four prongs of Rule 23(a) are met. Although it is unclear how many of the remaining Delayed/Relocated Class members would fall into the Relocated Subclass, the Court can safely presume that the number is sufficiently high to make joinder impracticable. FED. R. CIV P. 23(a)(1). There are also questions common to the class, such as whether the NFL had an obligation to provide relocation seats of equal or higher quality and whether the failure to provide such seats was a breach of contract. FED. R. CIV. P. 23(a)(2). Typicality exists even though the degree to which the class representatives' replacement seats were of lesser quality may differ significantly from unnamed members, because the claims of all class members are based on the same "legal and remedial theories" and "have the same essential characteristics." *Jenkins*, 782 F.2d at 472; *James*, 254 F.3d at 571. Finally, the named class representatives are adequate for the same reasons as apply to the named representatives for the Delayed Class. FED. R. CIV. P. 23(a)(4).

be liable to fans who specifically chose their original seats. Many fans purchased seats without knowing their exact location within the stadium; therefore, according to the NFL, these fans would not have expected to receive the original seat and relocation is not a breach of contract. The Court agrees that if the class member's initial choice is relevant to liability, this will necessarily require individualized inquiries. The thought process and knowledge of each class member prior to attending the game cannot be adjudicated by considering a representative's circumstances. However, even if the Plaintiffs succeed in showing that the NFL breached the ticket terms by relocating any ticketholder, the individualized issue of damages still predominates.

As is true for both the Entry Delayed Subclass and the Relocation Delayed Subclass, damages would need to be calculated individually for each Relocated Class member. Not only does the need to calculate damages for each individual make class adjudication impractical, but each putative class member will first need to show that his replacement seat was of "lesser quality". This inquiry cannot be accomplished on a class-wide basis, because every seat is unique. Certainly some common factors could be used to determine whether the seat was of "lesser quality", such as row number and yard line position, but there is no logical formula to determine at what point the differences render the new seat of inferior quality. Nor have Plaintiffs provided such a formula.[12] For example, if Ticketholder A's original seat was located at the 30 yard line in row 60 and her replacement seat was at the 50 yard line, but in row 65, it is

---

[12] Plaintiffs argue that a formula is unnecessary because NFL Senior Vice President of Events, Frank Supovitz, admitted that a seat with a higher row number or lesser yard line is a worse seat. Hr'g Tr. 91:18-92:15. Mr. Supovitz is responsible for planning and managing all NFL events without a home team. Pls. Supp. App. at 11. The Court finds that this was not a formula for determining which seats were of lesser quality, but a reference to certain factors that the NFL considers in evaluating whether one seat is of a higher quality than another. Pls. Supp. App. at 51 (deposition of Mr. Supovitz in which he agrees that level of the seat and face value of the ticket are *factors* for determining relative quality). Such statements do not establish that any seat with a higher row number or lesser yard line is *per se* of lesser quality.

unclear how to objectively determine whether the replacement seat was of "lesser quality". Even if a jury could make such a determination, when faced with Ticketholder B, whose original seat was located at the 50 yard line in row 60 and was relocated to the 30 yard line in row 40, knowing about Ticketholder A provides no guidance for examining the relative quality of Ticketholder B's original and replacement seats. Furthermore, because the NFL did not create a manifest showing which tickets were exchanged for which replacement seats, comparisons cannot be achieved by using common evidence; every potential class member would need to prove the location of his original seat and the replacement seat before "lesser quality" can be analyzed. Therefore, it would be impossible to provide a jury with all the necessary information to determine whether any given ticketholder received a "lesser quality" replacement seat without evidence from that person. Once this front-end membership inquiry was resolved, every class member would need to present his individualized damages. Depending on the resolution of the contested liability questions, this may require a determination of the relative values of the original and replacement seats irrespective of face value, the expenses incurred to attend the game, and pre-game expectations about seat quality. All of these questions will require individualized proof and could not be determined on a class wide basis.

With both a front-end inquiry to determine membership in the class—i.e., those who received inferior seats—and a back-end inquiry to calculate personal damages, the individual issues predominate over the common issues of contract interpretation.

The Court, accordingly, **DENIES** the Motion for Class Certification as to the Relocated Class.

### D. Obstructed View Class

Finally, Plaintiffs seek certification of an Obstructed View Class with the following definition: "all persons who paid for and/or acquired tickets to Super Bowl XLV for a seat within Cowboys Stadium [which had a restricted view of the field or Video Replay Board]... and whose ticket did not disclose an obstructed view." Pls. Br. at 13. These plaintiffs bring claims both for breach of contract and fraudulent inducement by omission. Pls. Consol. Second Am. Compl. ¶ 6.1-7.9 [Docket Entry # 182].

### i. Rule 23(a) Prerequisites

Defendants object only to the adequacy of the proposed class representatives under Rule 23(a)(4), for the same reasons they object to the adequacy of the Delayed Class representatives. The Court finds these objections unfounded, for the same reasons it rejected these objections as to the Delayed Class. The proposed Obstructed View Class meets the prerequisites for certification under Rule 23(a).[13]

### ii. Rule 23(b)(3)

Like the other proposed classes, the Obstructed View class fails the certification requirements because the need to calculate individual damages predominates over the common issues. The NFL admits that a seat with an obstructed view of the playing field should have been marked as restricted view, but argues that damages are limited to the difference between a non-

---

[13] The Court does find that all four prongs of Rule 23(a) are met. With over four thousand potential class members, the number is sufficiently high to make joinder impracticable. FED. R. CIV P. 23(a)(1). There are also questions common to the class, such as whether the NFL had an obligation to mark obstructed seats as "restricted view", and whether such an obligation would extend to obstructed views of the Video Replay Board. FED. R. CIV. P. 23(a)(2). Typicality exists even though the degree of obstruction experienced by the class members differs significantly from some of the unnamed class members, because their claims are based on the same "legal and remedial theories" and "have the same essential characteristics." *Jenkins*, 782 F.2d at 472; *James*, 254 F.3d at 571. Finally, the named class representatives are adequate for the same reasons as apply to the named representatives of the Delayed Class. FED. R. CIV. P. 23(a)(4).

obstructed price ticket and an obstructed ticket. Hr'g Trs. 60:7-18. However, it continues to deny

that seats with obstructed views of the Video Replay Board required notification of restricted

view.[14] *Id*. at 59:25-60:2. For fans who experienced an obstructed view of the field, liability is

not contested by the NFL, but an individualized inquiry to determine the extent of obstruction[15]

is necessary for purposes of gauging the materiality of the breach and the amount of damages

suffered by each class member.[16] Fans with restricted views of the Video Replay Board must

first prove that that is a breach of contract. That is a common question, but for those class

members who prove breach, the extent to which their view of the Video Replay Board was

obstructed, and the damages suffered as a result, is similarly an individual inquiry which

predominates over the common issues. No matter how the Court decided to manage the damages

phase (whether, for example to certify all issues but damages and then to have mini-trials or to

use a special master), it would still be necessary to adjudicate damages for every member of the

---

[14] The NFL has admitted that it asked Seating Solutions to provide sight-line analysis from the temporary seats to the Video Replay Board. Pls. Supp. App. at 53. However, it never considered marking seats with known obstructed views of the Video Replay Board as "restricted view". *Id*. at 55-56.

[15] Plaintiffs have suggested that the degree of obstructed view of the field and the Video Replay Board can be achieved through common evidence. They point to computer programs capable of mathematically calculating obstructions based on models of the stadium and the temporary seating; this would make a "battle of the photographs" unnecessary. Pls. Supp. Br. at 4-5. While it may be possible for such a program to identify seats with obstructed views, this does not eliminate the need to evaluate the extent of obstruction actually experienced by individual class members to determine their damages. Further, the Court anticipates that Defendants will make a *Daubert* challenge to any expert witness utilizing this method and at this time, the Court cannot conclude whether this evidence will be admissible. Finally, even if the testimony were accepted, the jury would still need to evaluate the testimony to determine if every identified seat was obstructed.

[16] Failure to mark as "restricted view" a seat with an obstructed view of 90% of the field may well be material, whereas failure to mark a ticket with an obstructed view of only 10% of the field may be a breach, but only a partial breach. The degree of resulting damages would be different as only the seats with materially obstructed views could claim damages as if the entire contract had been breached. The same analysis holds true if those with obstructed views of the Video Replay Board are able to prove that failure to mark those tickets as "restricted view", was a breach of contract.

class. *Bell Atlantic* is certainly instructive. The Court finds that certification of the Obstructed View Class's breach of contract claim is not appropriate.

The Court turns to the fraudulent inducement claim. Under Texas law, fraudulent inducement is a subset of fraud that arises in the context of a contract. *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001). Here, the ticket was a contract between the plaintiffs and the NFL. "The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990) (citing *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)). In order to show fraud based on an omission or concealment of material information, the plaintiff must show that the defendant had a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) ("As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information."). Whether such a duty exists is a question of law. *Id.* Additionally, plaintiffs must show that they relied on the omission or concealment. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997); *Worldwide Asset Purchasing, L.L.C. v. Rent–A–Ctr. E., Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.).

The questions over whether the NFL had a duty to disclose any obstructed views of the field or the Video Replay Board are common to the entire class. Nevertheless, reliance must be determined on an individual basis. Plaintiffs point to a series of cases that allow a Court to presume reliance in the context of securities fraud. *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) (interpreting statute to allow presumption of reliance when fraudulent omission is material); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (applying fraud on the market theory to

presume reliance).  Plaintiffs attempt to extend that presumption to common law fraud actions by

pointing to *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 220 (N.D. Tex.

2000) (applying reliance presumption to "vanishing premium" insurance case). After reviewing

this case, the Court is of the opinion that there is no basis to extend *Affiliated Ute*'s reliance

presumption to a case like this.

Where reliance must be ascertained individually, "[i]f the circumstances surrounding

each plaintiff's alleged reliance on fraudulent misrepresentations differ, then reliance is an issue

that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s

predominance requirement." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321-22 (5th Cir. 2005)

(citing *Castano,* 84 F.3d at 745; *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d

880, 882 (5th Cir. 1973)). This reasoning is confirmed in the Rule's Advisory Committee Notes:

"[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an

appealing situation for a class action….On the other hand, although having some common core,

a fraud case may be unsuited for treatment as a class action if there was material variation in the

representations made or in the kinds or degrees of reliance by the persons to whom they were

addressed." Rules Advisory Committee Notes, 39 F.R.D. 69, 103 (1966). Here, although the

"restricted view" language was omitted from each of the tickets in question, the materiality of the

omission differs between tickets because of the variance in the alleged obstructions. In that

sense, the omission is likely to be significantly different for each individual ticketholder. A

person who could not see 90% of the field might very well have chosen not to attend had that

been revealed, while a person who could not see 10% of the Video Replay Board might have

made the opposite choice. Further, the evidence suggests that different ticketholders had different

expectations regarding their seats—some likely relied on a lack of notice that their views would

be restricted when they purchased their specific seats, but others purchased seats without any obtaining any information about them.[17] *See e.g.*, Def. App. at 234-35, 465 (deposition testimony of class representatives Young and Fortune stating they did not know, when they purchased them, where there tickets would be located). The unique degree of knowledge possessed by each purchaser is highly relevant to the reliance element; accordingly, these issues are individualized. The Court, therefore, concludes that the variation in the materiality of the omissions combined with the individual questions of reliance and damages predominate over common issues. The Court finds that class certification for the Obstructed View Class's claim for fraudulent inducement is thus inappropriate.

The Court thus **DENIES** the Motion for Class Certification for the Obstructed View Class.

## IV. CONCLUSION

For the reasons stated above, the Plaintiff's Motion for Class Certification is **DENIED** in its entirety.

**SO ORDERED.**

Date: July 9, 2013.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

---

[17] In other words, there may be some members of the class who were aware that some seats might have obstructed views and purposely purchased tickets outside of the restricted view allocation. There may have been people who were aware that there were obstructed views from some seats, but purchased their tickets without knowing whether their seats were in those sections. Some people may have been unaware that certain seats would have obstructed views and expected to have full visibility of the stadium and/or Video Replay Board.