# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| BRUCE IBE, | § | |
| JASON MCLEAR, ROBERT FORTUNE, | § | |
| DEAN HOFFMAN, KEN LAFFIN, DAVID | § | |
| WANTA, and REBECCA BURGWIN, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | Civil Action No. 3:11-CV-00248-M |
| | § | |
| NATIONAL FOOTBALL LEAGUE, | § | |
| | § | |
| Defendant. | § | |

## DEFNDANT NATIONAL FOOTBALL LEAGUE'S
## MOTION FOR JUDGMENT AS A MATTER OF LAW
## <u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 50(a)</u>

George Bramblett, TBN 02867000
  george.bramblett@haynesboone.com
R. Thaddeus Behrens, TBN 24029440
  thad.behrens@haynesboone.com
Daniel H. Gold, TBN 24053230
  daniel.gold@haynesboone.com
Scott Ewing, TBN 24065214
  scott.ewing@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
(214) 651-5000
(214) 651-5940 (Facsimile)
**ATTORNEYS FOR DEFENDANT
NATIONAL FOOTBALL LEAGUE**

# TABLE OF CONTENTS

GROUNDS FOR JUDGMENT AS A MATTER OF LAW ........................................................... 3

A.    The NFL is entitled to judgment as a matter of law on Fortune and Hoffman's claims of fraudulent inducement because they have no evidence that the NFL intended to provide them seats with obstructed views of the playing field at the time their tickets entered the stream of commerce. ........................................................... 3

    1.    The evidence conclusively proves the NFL had an extensive quality control process intended to prevent ticketholders from having obstructed views of the field unless disclosed. ........................................................... 5

    2.    In sharp contrast to other seats in "the Curves," Fortune's and Hoffman's seats were not identified as having potentially obstructed views before their tickets entered the stream of commerce. ........................................................... 11

B.    The NFL is entitled to judgment as a matter of law on Fortune and Hoffman's claims of fraudulent inducement because they have no evidence that they were induced to purchase their tickets by a false representation or actionable omission by the NFL regarding sightlines, or that they actually and justifiably relied on any such representation. ........................................................... 23

C.    The NFL is entitled to judgment as a matter of law on Plaintiffs' claim for exemplary damages. ........................................................... 24

    1.    The NFL is entitled to judgment as a matter of law because no reasonable jury could find fraud by clear and convincing evidence. ........................................................... 24

    2.    The NFL is entitled to judgment as a matter of law because no reasonable jury could find reprehensible conduct by the NFL sufficient to sustain an award of exemplary damages. ........................................................... 25

D.    The NFL is entitled to judgment as a matter of law on Burgwin's claim based on her daughters' two tickets because she has not presented legally sufficient evidence of any damages. ........................................................... 26

E.    Other grounds for granting judgment as a matter of law. ........................................................... 27

REQUEST FOR RELIEF ........................................................... 31

Defendant National Football League ("NFL"), pursuant to Federal Rule of Civil Procedure 50(a), at the close of the Plaintiffs' evidence and before submission of the case to the jury, files the following Motion for Judgment as a Matter of Law. The NFL respectfully requests that the Court enter judgment as a matter of law for Defendant and against Plaintiffs Bruce Ibe, Ken Laffin, David Wanta, Rebecca Burgwin, Jason McLear, Robert Fortune, and Dean Hoffman (collectively, "Plaintiffs"), with respect to any and all claims asserted by Plaintiffs.

In moving for judgment as a matter of law at the close of the evidence and before submission of the case to the jury, Defendant hereby incorporates by reference (i) Defendant's Motion for Partial Summary Judgment and Partial Dismissal for Lack of Subject Matter Jurisdiction (Dkt. No. 273, 311) (ii) Defendant's Motions to Dismiss (Dkt. No. 53, 65, 72, 80) and (iii) any oral motions for judgment as a matter of law.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50, a court may enter judgment as a matter of law when it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on an issue.[1] Rule 50 allows the district court to "remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'"[2] "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."[3]

"A court should grant a Rule 50(a) motion not only when the non-movant presents no evidence, but also when there is not a sufficient conflict in substantial evidence to create a jury

---

[1] Fed. R. Civ. P. 50(a).

[2] *Weisgram v. Marley Co.*, 528 U.S. 440, 447-48 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521 (2d ed. 1995)).

[3] Fed. R. Civ. P. 50(b).

question."[4] To be substantial, evidence must be "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions" regarding the case's outcome.[5]

## GROUNDS FOR JUDGMENT AS A MATTER OF LAW

A.     **The NFL is entitled to judgment as a matter of law on Fortune and Hoffman's claims of fraudulent inducement because they have no evidence that the NFL intended to provide them seats with obstructed views of the playing field at the time their tickets entered the stream of commerce.**

To prove fraudulent inducement, one of the elements Fortune and Hoffman must prove is that at the time the NFL promised that their seats would not have obstructed views, the NFL had no intention of performing as promised.[6]  At summary judgment this Court was "skeptical that the Obstructed View Plaintiffs can ultimately prove fraudulent intent by the NFL at the time their tickets entered the stream of commerce" and said it would "be mindful at trial of whether the evidence admitted satisfies the fraudulent intent element."[7]

This Court's skepticism was well-founded.  Fortune and Hoffman have failed to present any evidence that the NFL intended, at the time the tickets entered the stream of commerce, to

---

[4] *Travis v. Bd. of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir. 1997) (citations and internal quotation marks omitted); *see also Newsome v. Collin Cnty. Cmty. Coll. Dist.*, 189 F. App'x 353, 355 (5th Cir. 2006).

[5] *Haire v. Board of Supervisors of Louisiana State Univ.*, 719 F.3d 356, 369 (5th Cir. 2013) (citation and internal quotation marks omitted); *Newsome*, 189 F. App'x at 355.

[6] Dkt. No. 325 at 21-23; *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010) ("A promise to do an act in the future is an actionable misrepresentation when made with the intent to deceive and with no intention of performing the act."); *Flourine on Call, Ltd. v. Flourogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004); *Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002) ("In the case of a promise of future performance, the plaintiff also has to prove that the promise was made with no intention of performing at the time it was made.") (citation and internal quotation marks omitted); *L&C Consultants, LLC v. Ash Petroleum, Inc.*, No. 3:07-cv-1904, 2009 WL 3110200, at *6 (N.D. Tex. Sept. 29, 2009) ("To show fraud based on promise of future performance, a plaintiff must also show that the person making the promise had no intention of performing at the time he made the promise."); *Reyna v. First Nat'l Bank in Edinburg*, 55 S.W.3d 58, 68 (Tex. App.—Corpus Christi 2001, no pet.) ("Because the representation in this case involves a promise to do an act in the future, Reyna also had to prove that, at the time FNB made the promise to pay the invoices, it had no intention of performing the act."); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act.").

[7] Dkt. No. 325 at 23.

provide Fortune and Hoffman seats with obstructed views of the playing field.[8] The evidence shows the NFL's intent was exactly the opposite. The evidence in the record conclusively demonstrates that the NFL had a quality control process specifically intended to prevent ticketholders from having undisclosed obstructed views on game day. If Fortune's or Hoffman's seats fell through some crack in the process and they ended up with obstructed views of the football field on game day, that would be a breach of contract. Not fraud. No reasonable jury could find that the NFL intended at the time the tickets entered the stream of commerce for Fortune or Hoffman to have obstructed views on game day.[9]

The evidence at trial shows two potential times at which Fortune and Hoffman's tickets "entered the stream of commerce." The first is on January 11, 2011, when the majority of tickets to Super Bowl XLV were released for sale.[10] The second is on January 23, 2011, when additional tickets allotted to the two teams participating in Super Bowl XLV were given to the teams and released for sale.[11]

Regardless of the date used, the evidence presented at trial confirms that the NFL at all times intended to perform—and made extensive efforts to perform—its contractual promise to provide seats with unobstructed views of the playing field.

---

[8] Dkt. No. 325 at 23; Dkt. No. 311 at 19-25.

[9] For the same reasons, no reasonable jury could find that the NFL knew at the time the tickets entered the stream of commerce that its promise of unobstructed views was false, or made the representation recklessly, without knowledge of the truth and as a positive assertion.

[10] 3/4 Tr. at 62:14.

[11] 3/4 Tr. at 62:19-23; 3/5 Tr. at 99:17-100:4. Fortune and Hoffman were not the original purchasers of their tickets. At trial, Fortune testified that he purchased his ticket from his sister on approximately January 30, 2011. 3/5 Tr. at 187:15 – 188:6.  Hoffman confirmed that he purchased his tickets from an online ticket broker on January 25, 2011. 3/6 Tr. at 91:8-10, 92:7-11.

1.  **The evidence conclusively proves the NFL had an extensive quality control process intended to prevent ticketholders from having obstructed views of the field unless disclosed.**

As multiple witnesses testified, the NFL understood its obligation to provide ticketholders with unobstructed views of the playing field.[12]  The NFL's policy, which it applied to Super Bowl XLV, was not to sell a ticket that had an obstructed view of the playing field without marking it as "restricted view."[13]

Several witnesses testified at length at trial regarding the NFL's efforts to ensure that all seats sold to fans had unobstructed views of the playing field unless they were marked as having an obstructed view.  Frank Supovitz, Vice President of Events for the NFL at the time of Super Bowl XLV, testified that the NFL had in place an extensive quality control process to ensure that no seats at Super Bowl XLV had obstructed views of the playing field unless the tickets were marked as "restricted view." Todd Barnes of Populous also provided extensive trial testimony in which he walked through his multi-step process to identify potential sightline issues so they could be resolved before game day.

The NFL's efforts to prevent fans from having obstructed views of the field began four years before Super Bowl XLV, during the Super Bowl XLV bidding process. Supovitz explained that an entity that bids on a Super Bowl must agree to provide at least 70,000 seats, and any seats installed to meet that minimum number must be "acceptable to the NFL in its sole discretion," meaning that every seat "would need to be an unobstructed seat; otherwise it could not be counted" towards the 70,000 minimum required.[14] If the team installed seats that were not

---

[12] 3/3 Tr. at 65:4-13 (Supovitz); 3/5 Tr. at 94:6-14 (F. Otto); 3/6 Tr. at 41 (G. Otto); 3/9 Tr. at 83 (Barnes).

[13] 3/3 Tr. at 215:1-6; 3/5 Tr. at 102:17 – 103:6.

[14] 3/3 Tr. at 51:4-11.

acceptable to the NFL, the NFL could remove those seats at the bid committee's expense.[15]

After North Texas was selected in 2007 to host Super Bowl XLV, the NFL further ensured sightline quality through a series of contractual provisions:

- As Supovitz testified, the NFL entered into a License Agreement with Cowboys Stadium, L.P. ("Cowboys Stadium"), which required that all temporary seats "must be in compliance with all applicable laws and be of a suitable standard commensurate with the quality and standards of the NFL Super Bowl viewing experience, ***including but not limited to appropriate sightlines*** . . . ."[16]

- Consistent with that obligation, the Request for Proposals (RFP) sent by Cowboys Stadium to potential seating contractors for Super Bowl XLV set out a series of specifications. The very first specification listed in the RFP was that "each [temporary seating] area shall be designed to ***optimize sightlines*** and provide a positive fan experience for patrons attending events at Cowboys Stadium."[17] As Supovitz explained, the requirement that contractors "optimize sightlines" was meant to ensure that seats had unobstructed views, from "sideline to sideline and back of end zone to back of end zone."[18]

- The RFP, once accepted, became a part of the contract between Cowboys Stadium and Seating Solutions.[19] Scott Suprina, the principal of Seating Solutions, testified that he understood that Seating Solutions was required to provide seats with unobstructed views of the field.[20]

In addition to contractually requiring that the temporary seats have unobstructed views of the field, the evidence further proves that the NFL took steps to inspect and verify the sightlines from the temporary seats.

The NFL hired a premier architectural and event management firm, Populous Events, Inc., to, among other things, help ensure that the temporary seats "were going to provide the NFL with the proper quality seat that would be expected for the Super Bowl," meaning that the "seat

---

[15] 3/3 Tr. at 56:2-7.

[16] 3/3 Tr. at 64:13-23; Pls' Ex. 119 (emphasis added).

[17] 3/3 Tr. at 76:4-9; Def Ex. 505, Section 1A, NFL 31268 (emphasis added); 3/6 Tr. at 276:17-22; 3/9 Tr. at 20.

[18] 3/3 Tr. at 76:23-24; 3/6 Tr. at 305:2-4.

[19] 3/6 Tr. at 318:10-12.

[20] 3/6 Tr. at 276:17-277:1.

is going to have proper sightlines to the field."[21] Todd Barnes, an architect and the NFL's primary point of contact at Populous,[22] had played this same role as an architectural and event planning consultant for the prior 20 Super Bowls.[23] Barnes first became involved in the planning for Super Bowl XLV in 2007, when he was engaged by the NFL to review drawings of the plans for Cowboys Stadium, which had yet to be built.[24]

Barnes testified that he employed a three-step review process of the seat installation process. The first step is a visit to the stadium site, where he would "become familiar with the stadium and the stadium grounds."[25] Barnes, along with several other employees of Populous, first visited Cowboys stadium over several days in November 2009,[26] at which point they "reviewed the facilities, the way that the stadium is layed out, on the outside of the stadium and the inside of the stadium, to try and understand how the -- the stadium facilities exist."[27] Barnes and the Populous team returned to Cowboys Stadium in March, April, May, and June of 2010.[28] These visits allowed Barnes to better "understand the overall three-dimensional aspect of the stadium."[29]

Following the site visits, Barnes' review process then entered its second phase: the "plan review phase."[30] In this phase, Barnes completed his "own review" of the seating plans that were

---

[21] 3/9 Tr. at 83:7-18; *see also* 3/3 Tr. at 77:15-20; 79:19-25; 3/9 Tr. at 81:18-20.

[22] 3/9 Tr. at 64:4; 3/9 Tr. at 71:22-24.

[23] 3/9 Tr. at 68:15-18.

[24] 3/9 Tr. at 71:5-11.

[25] 3/9 Tr. at 85:15-21; *see also* 3/3 Tr. at 89:24-25.

[26] 3/9 Tr. at 86:22-23.

[27] 3/9 Tr. at 87:12-16.

[28] 3/9 Tr. at 88:4; 3/9 Tr. at 89:13-14.

[29] 3/9 Tr. at 89:1-2; *see also* 3/3 Tr. at 79:7-9.

[30] 3/9 Tr. at 90:5-7; 91:17-19.

provided by Seating Solutions.[31] Barnes first received Seating Solutions' seating plans on June 24, 2010.[32] Barnes testified that, once he received the seating plans from Seating Solutions, he would conduct his own "independent review" on behalf of the NFL in which he "would spot the location for where the seats are on the drawing and complete evaluations as to what the sightline is going to be to the field of play."[33] After its initial review, Populous brought its various sightline concerns to the NFL's attention so that they could be resolved well before Super Bowl XLV.[34] Populous also worked directly with the seating contractor on resolution of issues.[35]

After conducting an extensive review of the plans and schematics, Barnes' review entered its final stage: the "on-site" review.[36] During this review, Barnes would "physically, visually review and continue [his] observations of the stadium as to how it works and operates."[37] This process began on January 7, 2011, and continued nearly every day until the day of Super Bowl XLV.[38] Nearly sixty people from Populous were involved with the on-site review.[39] During this time, Scott Suprina of Seating Solutions also testified that "anyplace that [he] thought there could be a sight concern" he personally sat in seats to check the views of the field.[40]

In addition to the extensive work performed by Barnes, the NFL's own personnel also circulated around the seats to ensure that the sightlines were in accordance with the NFL's

---

[31] 3/9 Tr. at 91:13-14, 91:18-19; 90:10-14.

[32] 3/9 Tr. at 92:10-25; Def. Ex. 507-D.

[33] 3/9 Tr. at 116:24 – 117:7.

[34] 3/9 Tr. at 120:10-13.

[35] 3/9 Tr. at 91:13-16.

[36] 3/9 Tr. at 165:20-22.

[37] 3/9 Tr. at 167:12-14; 3/3 Tr. at 104:6-19.

[38] 3/9 Tr. at 166:20; 168:4-6.

[39] 3/9 Tr. at 167:24-25.

[40] 3/6 Tr. at 289:18-20; *see also* 3/6 Tr. at 288:19-25; 290:21 – 291:5.

standard for unobstructed views. Supovitz testified that members of his staff, himself included, "walked the stadium, checking on sightlines," and "sat anyplace where we thought we might have a problem."[41] Likewise, Fred Otto, Director of Event Management for the NFL, testified that two temporary NFL employees, Mark Goldstein and Geoff Otto, would on the week of the game "walk around and look at all of the seating and all of that sort of thing."[42] While there, they would "basically to go to the stadium on a daily basis and check on the progress and the accuracy of the seats that were being installed."[43] In particular, "they would identify the situation and report it back to Populous, because Populous, again, had all of the right people . . . that coordinated who can solve this, who can solve that."[44] Geoff Otto testified at trial that his responsibilities the week before the game was to look for potential issues with the seats, including "sightline issues," where "you could not see the [entirety of the] field from a seated position."[45]

Lastly, in the event this three-tiered process of checking seats failed to identify a particular seat or seats as obstructed view by gamed day, the NFL also had a standard practice for every Super Bowl of holding back tickets from sale so that it could accommodate fan complaints on game day – including complaints about the view from the seat.[46] If an obstructed view was discovered after a ticket had been sold, the intent was to use those extra tickets and

---

[41] 3/3 Tr. at 108:12-20.

[42] 3/5 Tr. at 89:19-22; 3/5 Tr. at 90:4-7; 90:24; 3/6 Tr. at 24:7-18., 42:15-17.

[43] 3/5 Tr. at 90:18-20.

[44] 3/5 Tr. at 91:11-15; *see also* 3/6 Tr. at 26:8-9.

[45] 3/6 Tr. at 41:13-15; 19-21.

[46] 3/3 Tr. at 99:18 – 100:2; 3/5 Tr. at 105:6-7 (Fred Otto: "We always hold back a certain amount of tickets for game day problems.").

"have somebody relocate you from that seat to another seat where the view is better."[47]

The actions taken by the NFL when potentially obstructed view seats were discovered confirms that the NFL intended to provide ticketholders with unobstructed views of the field on game day unless the ticket was marked "restricted view."  For example, in September 2010, Barnes reviewed Seating Solutions' schematics and identified a potential obstruction involving columns in the two Silver Level end zone seating sections (Sections 321A – 325A and 345A – 349A).[48] Barnes asked Seating Solutions to perform a sightline analysis of the area.[49] Seating Solutions responded that the areas at issue "should not be considered bad seats or bad sight lines as 99% of the time they will not have an obstructed view. These . . . areas represent spectator seats that at some point in time will cross the columns located at each level momentarily obstructing [the] view."[50]  Barnes nevertheless decided to conduct his own "analysis to ensure that every fan that is going to come into that stadium is going to have a proper seat with a proper sightline to the field of play."[51] Barnes ultimately recommended that the seats at issue be marked as "restricted view" because those seats did not meet the NFL's standard of an unobstructed view of the field.[52] In particular, he told the NFL that "[m]ost of these seats will be considered okay, since the majority of play will occur down the middle of the field where sightlines are not obstructed. However, you probably have to flag these seats as obstructed since they will be when

---

[47] 3/3 Tr. at 99:18 – 100:2; 3/5 Tr. at 95:22-24 ("We actually had people up in the stands on game day to relocate" people whose seats had obstructed views).

[48] 3/4 Tr. at 95:24 – 96:11; 3/6 Tr. at 228:22-24; 229:4-7; Def. Ex. 517-D; 3/9 Tr. at 142:9-14.

[49] 3/9 Tr. at 144:22-24; Pl. Ex. 60; Def. Ex. 520, 525, NFL-16455 (emphasis added); 3/3 Tr. at 92:9-15.

[50] Def. Ex. 520, NFL-11315; see 3/6 Tr. at 284:24 – 285:9 (The pole was relatively small, so it was nowhere near blocking 10 percent of the field.").

[51] 3/9 Tr. at 153:3-6.

[52] 3/9 Tr. at 153:10-11.

plays occur within the sightline shadow of the columns."[53] Taking the more conservative approach and relying on Barnes' expertise, the NFL marked those 1,458 tickets as "restricted view," and reduced the price from $900 to $600.[54] After discussing the issue with the Dallas Cowboys, the NFL allocated those "restricted view" tickets to the Dallas Cowboys.[55]

> **2.      In sharp contrast to other seats in "the Curves," Fortune's and Hoffman's seats were not identified as having potentially obstructed views before their tickets entered the stream of commerce.**

Fortune and Hoffman were both seated in Row 3 of sections within the Curves.[56]  The timeline of specific evidence regarding the Curves proves that the NFL did not have fraudulent intent with respect to Fortune's and Hoffman's seats at the time their tickets entered the stream of commerce:

- On June 24, 2010, Barnes first received Seating Solutions' seating plans for his independent review.[57] These seating plans identified many seats--including some specific seats in the Curves--that were colored green, meaning they had to be "field verified."[58] The June 2010 plans did not mark either Mr. Hoffman or Mr. Fortune's seats as needing to be field verified.[59]

- On July 27, 2010 Seating Solutions provided the next set of labeled drawings for the 200 level temporary seating on the Main Concourse.[60]   The drawings indicated that certain seats in the Gap sections, marked in green, "need to be sight line verified," and were not included in the total seat count.[61]  No seats in the Curves were identified as needing to be "sight line verified," which communicated to the NFL that Seating Solutions was not expecting those seats to

---

[53] Def. Ex. 525; 3/9 Tr. at 155:10-15.

[54] 3/3 Tr. at 94:12-13; 3/3 Tr. at 93:6-10; 3/5 Tr. at 102:21 – 103:6 (Fred Otto testimony regarding marking seats as "restricted view"); 3/5 Tr. at 117:12-19; Def. Ex. 525-D; 3/9 Tr at 156:2-3.

[55] 3/3 Tr. at 92:9-15; 95:1-6; 3/4 Tr. at 96:21-23.

[56] 3/4 Tr. at 115:4-6; 3/5 Tr. at 154:19-25 (Fortune); 3/4 Tr. at 115:7-9; 3/6 Tr. at 113:8-12 (Hoffman); Dkt. No. 421 at 16.

[57] 3/9 Tr. at 92:10-25; Def. Ex. 507-D.

[58] 3/9 Tr. at 95:14-15.

[59] 3/9 Tr. at 112:1-19; Def. Ex. 507-D.

[60] Def. Ex. 510; 3/3 Tr. at 83-84.

[61] Def. Ex. 510; 3/3 Tr. at 86-88.

be obstructed,[62] and would instead have proper sightlines to the field of play."[63] Neither Fortune nor Hoffman's seats were marked in green as needing to be sight line verified,[64] meaning both should have been "good and valid seats with proper sightlines to the field of play."[65]

- On September 24, 2010, Todd Barnes sent Fred Otto of the NFL a sightline analysis of the impact of certain columns on the view from seats on the main concourse level.[66] As Barnes testified, he sent this email to ensure that Mr. Otto had an "accurate understanding as to how many seats are going to potentially have sightline issues," so that they could be fixed.[67] In this same email, Barnes reported to Mr. Otto that "[t]he curves appear to be fine."[68] By this, Barnes meant that the "sightlines would be appropriate."[69]

- Four days later, on September 28, 2010, Barnes sent Scott Suprina an email attaching the list of seats in the Curves and Gaps that had previously been listed in green as needing to be sight line verified.[70] Barnes asked Suprina to "verify that the seats have acceptable sightlines to the field of play. You mentioned during our conference call today, but I want to be certain."[71] As Barnes testified, he felt it important to follow-up with Suprina because "the seating is . . . extremely important. It's one of the most important things associated with -- fans have to see the field of play. So I'm not just taking for granted that during a conference call that he's going to say that these seats are okay. So I'm checking on everything, doublechecking everything, to assure that the plans are corresponding to what he's actually saying in a conference call."[72]

---

[62] Def. Ex. 510; 3/3 Tr. at 88-89; 3/9 Tr. at 125:1-7.

[63] 3/9 Tr. at 125:10-14.

[64] Def. Ex. 510; 3/9 Tr. at 125:22-24; 126:6-13.

[65] 3/9 Tr. at 126:22-23.

[66] Def. Ex. 515; 3/9 Tr. at 130:22 – 131:11.

[67] 3/9 Tr. at 131:14-16; 19-22; 23-24.

[68] Def. Ex. 515-D.

[69] 3/9 Tr. at 132:7.

[70] Def. Ex. 518-D.

[71] Def. Ex. 518-D; 3/9 Tr. at 134:12-16.

[72] 3/9 Tr. at 135:15-22.

- On October 14, 2010, shortly before the deadline to provide information for printing the tickets, Eric Finkelstein of the NFL emailed Todd Barnes that he "[s]poke to Fred [Otto], he just wants to make sure that the added 4 rows of seats at the back of sections 201-204 (next to the gap starting in 205) are also completed unobstructed."[73]  Barnes responded:  "No obstructions to field."[74]

- On or around November 1, 2010, the NFL submitted the information to the printer to print the tickets.[75]  Consistent with the analysis conducted and information provided to the NFL as of that date, Fortune's and Hoffman's tickets were not marked "restricted view."

- On January 6, 2011, Seating Solutions submitted final drawings of the stadium before installation would begin, including the Curves. That drawing did not identify any seats in green as needing to be sightline verified.[76] Based on this drawing, Barnes concluded that the seats had "proper sightlines to the field of play."[77]

- On January 9, 2011 (the first day that the NFL took possession of Cowboys Stadium) Mr. Barnes separately sent Jack Hill and Fred Otto photos from a seated and standing position in Section "203 in the back row" and asked Hill whether "this is what we are expecting for sightlines from the top row of the temp seats?"[78]  Barnes reported, "[t]he back few rows is what we expected. You can see the whole field, but that is literally all you can see."[79] At the time, the "back row" of the Curves was Row 6.[80] Barnes sent these photos to the NFL so that they could "fix the problem."[81]

- In response to Barnes' emails and photos, Otto said that "[t]hese look awful" and asked Barnes to send a list of all sections affected.[82]  Barnes identified rows 4, 5 and 6 in the 200 level with Rows 5 and 6 being the worst.[83]  Indicating that "this affects about 108 seats," Otto also forwarded the issue to Frank Supovitz, who

---

[73] Def. Ex. 527-D; 3/9 Tr. at 137:8-23.

[74] Def. Ex. 527-D; 3/9 Tr. at 138:10-12. Barnes testified that Mr. Otto wanted this information because he "needs to understand where there are potential ticket problems at the stadium so that he doesn't release tickets inappropriately to fans that have potentially obstructed views of the field." 3/9 Tr. at 139:9-12.

[75] 3/5 Tr. at 96-97

[76] Def. Ex. 535; 3/9 Tr. at 166.

[77] 3/9 Tr. at 166.

[78] Def. Ex. 622-D; Def. Ex. 540-D; Def. Ex. 623-D, Pl. Ex. 67.

[79] Def. Ex. 540-D.

[80] 3/9 Tr. at 179:4-9; Def. Ex. 535-D.

[81] 3/9 Tr. at 176:16.

[82] Def. Ex. 539-D.

[83] Def. Ex. 539-D; 3/9 Tr. at 182:8-12.

responded "AKkkkkk."[84] Tickets to Super Bowl XLV had not yet been released for sale.  In response Otto stated that he "can manage this as I assigned all of these seats to the 2 participating teams," whose tickets were not scheduled for distribution until January 23,[85] and "could switch out 54 seats for each of the 2 teams to keep them whole."[86]

- On January 11, 2011, the first group of Super Bowl tickets was released for sale.[87]

- On January 14, 2011, Otto asked Barnes to confirm which seats in the Curves were affected "before I notify the AFC and NFC clubs of a seat change."  Barnes responded that the back 2 rows, Rows 5 and 6, were affected most.  Row 24, also known as Row 4, was "tolerable because you can most see the whole field when you stand up."[88]  No issue was identified with respect to Row 3, where Fortune's and Hoffman's seats are located.

- During this time frame, Supovitz testified that he inspected the seats in Rows 5 and 6 with Barnes, and found that they "were not fit . . . for sale," and "wouldn't have even [been] approved for restricted view," because they were "wholly inappropriate."[89]  "We also looked at row 4. And row 4, we determined, was able to see, again, end zone to end zone -- back of end zone to back of end zone and sideline to sideline."[90]  Supovitz testified that no issue was raised about the overhang blocking the view from Row 3.[91]

- The NFL resolved this issue by "killing" every seat—all 108—in Rows 5 and 6 of the Curves sections,[92] as Barnes recommended.[93] As a result, those 108 seats were never sold to the public, and were not reflected in the final "as built" seating manifest drawings from Seating Solutions.[94] Notably, the NFL did so even though Scott Suprina believed that the "seats themselves were fine, with some obstruction of the scoreboard," and that the NFL "shouldn't knock the seats out."[95]

---

[84] Def. Ex. 544-D.

[85] 3/4 Tr. at 62:19-23; 3/5 Tr. at 99:17-100:4.

[86] Def. Ex. 544-D.

[87] 3/4 Tr. at 62:14.

[88] Def. Ex. 547-D.

[89] 3/3 Tr. at 106:20-24; *see also* 3/4 Tr. at 67:21-24 ("I took them out because I believed that they would be inappropriate seats to be sold.  The obstruction was not a partial obstruction, it was a slice of the end zone.  It was significant, so I took them out of the inventory.").

[90] 3/3 Tr. at 106:14-16.

[91] 3/3 Tr. at 108-09.

[92] 3/3 Tr. at 106:7-13; 3/6 Tr. at 20:17-20; 3/6 Tr. at 29:8-11; 3/6 Tr. at 277:18-21; 3/5 Tr. at 100:9-17.

[93] 3/9 Tr. at 183:17-22.

[94] 3/4 Tr. at 66:14-22; 3/5 Tr. at 100:9-17; Pl. Ex. 87-90; 3/9 Tr. at 184:3.

[95] 3/6 Tr. at 291:19-22.

Nonetheless, Barnes disagreed with Suprina's recommendation because the seats were inconsistent with the NFL's efforts to maintain "the highest quality viewing experience."[96]

- On January 23, 2011, additional tickets allotted to the two teams participating in Super Bowl XLV were given to the teams and released for sale.[97]

- In late January 2011, Fred Otto asked Todd Barnes to identify every seat in the stadium that had a problem, including an obstructed view.[98] In response, on January 26 and 27, 2011, Todd Barnes sent Fred Otto a series of drawings that, among other things, identified in detail every seat in the 200 Level (including those in the Curves) that were potentially problematic for any reason, including possible obstructed views.[99] Barnes explained that Otto needed this information because he needed to "know absolutely every location in that stadium where there's a potential seating problem."[100] No issue with the overhang was identified in Hoffman's section, 218A.[101] The only issue that was identified – a potential obstruction from an ADA platform[102] – was resolved by removing the platform,[103] and Hoffman does not claim his view was obstructed by an ADA platform or people in wheel chairs sitting in front of him.[104] Some seats in other portions of Fortune's section 241A were identified as being obstructed due to a column, but in contrast Barnes did not indicate any obstruction from Row 3 where Fortune's seat is located.[105] As Mr. Barnes testified, this meant that "the sightline from [Fortune's] seat was an acceptable and proper seat with sightline."[106]

- During the week before the Super Bowl, the NFL had temporary employees Geoff Otto and Mark Goldstein on-site at Cowboys Stadium checking seats and sightlines. As Geoff Otto, Barnes and others explained, the whole purpose of those inspections was to identify any issues so they could be resolved before game day by fixing the issue or making plans to relocate the fan to an

---

[96] 3/6 Tr. at 291:23-25; 292:4-6.

[97] 3/4 Tr. at 62:19-23; 3/5 Tr. at 99:17-100:4. Fortune and Hoffman were not the original purchasers of their tickets. At trial, Fortune testified that he purchased his ticket from his sister on approximately January 30, 2011. 3/5 Tr. at 187:15 – 188:6. Hoffman confirmed that he purchased his tickets from an online ticket broker on January 25, 2011. 3/6 Tr. at 91:8-10, 92:7-11.

[98] 3/9 Tr. at 196:1-3.

[99] Def Ex. 552-D; Def. Ex. 554-D; 3/9 Tr. at 195:14-25.

[100] 3/9 Tr. at 196:17-18.

[101] Def Ex. 552-D.

[102] Def Ex. 552-D; 3/9 Tr. at 200:13-16.

[103] Def. Ex. 555-D, 3/9 Tr. at 201:25-202:3, 203:3-5

[104] 3/6/ Tr. at 83.

[105] Def. Ex. 554-D; 3/9 Tr. at 198:2-8.

[106] 3/9 Tr. at 198:14-15.

unobstructed seat.[107]   Geoff Otto's notes say "ok" next to Hoffman's seat.[108] There is a notation of 1-OBST next to Fortune's seat and the process was to bring any such issue to Barnes to remove the possibility of any fan receiving an obstructed view seat on game day.[109]

- After and as a result of this extensive quality control process, Barnes testified that on the day of Super Bowl XLV he did not believe that any fan had a seat with an obstructed view of the playing field that was not marked "restricted view."[110]

This timeline demonstrates that before and around the time the tickets entered the stream of commerce, the NFL and Populous worked to identify any sightline issues in the Curves and killed those seats that were determined to be obstructed. At no time during this process did Populous or the NFL identify either Fortune's or Hoffman's seats as being obstructed.[111]  In light of this evidence of the NFL's efforts to eliminate obstructed view seats, along with the other extensive evidence of the NFL's quality control process, no reasonable jury could find that the NFL intended to provide Fortune and Hoffman seats with obstructed views at the time the tickets entered the stream of commerce.

None of Plaintiffs' purported evidence could support a jury finding that the NFL intended to provide Fortune and Hoffman seats with obstructed views of the field when their tickets entered the stream of commerce.

First, the emails from January 2011 regarding views from the Curves, discussed above, were part of the NFL's process of identifying and addressing obstructed view issues.  And importantly, those emails relate to Rows 4 through 6, not Row 3 where Fortune and Hoffman

---

[107] 3/9 Tr. at 204; 3/6 Tr. at 49-50; 3/5 Tr. at 91:16-19.

[108] Pl. Ex. 182 at NFL-032655.

[109] Pl. Ex. 182 at NFL-32660, 3/9 Tr. 203-205, 3/6 Tr. 45:15-18,  68:18 – 69:5, 3/6 Tr. 76:25-77:8, 3/6 Tr. 29:3-11.

[110] 3/9 Tr. at 209.

[111] As described above, Hoffman's seats were identified as having "poor sightlines due to ADA platform."  *Id.*  That ADA platform was later removed, see Def. Ex. 555-D, 3/9 Tr. at 201:25 – 202:3, 202:3, 203:3-5, and Hoffman is not complaining that his view was obstructed by a platform.  3/6 Tr. at 83.

were sitting. Row 3 was not identified as having a sightline issue from of the overhang.[112] Barnes testified that he "didn't perceive there to be a sightline obstruction or a sightline issue to the field of play" with respect to Rows 1, 2, and 3.[113] Identification of potential issues regarding views from Rows 4 through 6 does not give rise to any inference of a potential issue with Row 3.  The view from every seat and every row is different.  As Barnes testified at trial, one seat could have an obstructed view and the adjacent seat could have a perfectly fine view.[114]  With respect to the Curves, Supovitz explained at trial that the "overhang of the deck immediately above" restricted the view from Rows 5 and 6 (which the NFL killed), but that "[a]s you went forward [in the section] you were getting clear of the overhang."[115] Barnes likewise explained, "when you're seated further back, you see less of the field. And as you go forward, you see more of the field."[116] Supovitz and Barnes also specifically "looked at row 4. And row 4, we determined, was able to see, again, end zone to end zone -- back of end zone to back of end zone and sideline to sideline."[117] As Barnes explained, from the vantage point of Row 4, "you could see the full field of play from a seated position, sideline to sideline, end line to end line."[118] Row 4 remained in use because Barnes was satisfied that it had a "full view of the playing field."[119]  As it relates to the overhang, Row 3, where Fortune and Hoffman were seated, would have a better view than Row 4.

---

[112] 3/3 Tr. at 107:24 – 108:4; *See* Def. Ex. 539-D; 544-D; 547-D; 622-D.

[113] 3/9 Tr. at 182:22-23.

[114] 3/9 Tr. at 150:18-24.

[115] 3/3 Tr. at 107:18-21.

[116] 3/9 Tr. at 183:3-5.

[117] 3/3 Tr. at 106:14-16.

[118] 3/9 Tr. at 184:11-13.

[119] 3/9 Tr. at 184:19-21. Plaintiffs' efforts to rely on emails from Mr. Barnes regarding the view from Row 4 fare no better, because those emails relate to views of the videoboard from Rows 4, 5, and 6, not the playing field. *See* 3/9 Tr. at 275-276; Pl. Ex. 69.

That not all seats or rows in the Curves had the same views was proven at trial with photographs from various locations in the Curves.  The photo Barnes took from Row 6 (before it was killed) showed the overhang obstructing a significant portion of the field.[120]   The photo taken by Gregory Pawlowski of his view from Row 4 of a section in the Curves showed no obstruction of the field from the overhang.[121] The photos taken by David Aiello of his view from Row 1 of a section in the Curves do not even show the overhang or reflect that the overhang is nowhere close to blocking the field.[122]   The photo Barnes took from Row 1 of the Curves similarly shows a fantastic view of the field with no obstruction from the overhang.[123]   Simply put, the fact that the NFL identified sightline issues in some rows of the curves is not evidence that the NFL knew other rows of the Curves had issues.   Rather, the evidence at trial was that Fortune's and Hoffman's specific seats in Row 3 of sections of the Curves were never identified as having obstructed views of the field caused by the overhang that impacted seats further back in those sections.  Contrary to Plaintiffs' suggestion, the January 2011 emails regarding views from the Curves actually prove that the NFL did not intend to provide Fortune and Hoffman with obstructed views.

Second, e-mails regarding the Silver Level – where certain seats were identified as obstructed and marked as "restricted view" – do not help Plaintiffs prove fraudulent intent regarding Fortune's and Hoffman's seats.  As an initial matter, Fortune's and Hoffman's seats were in the Curves on the 200 level, main concourse; the Silver Level is the 300 level.  Those emails do not suggest any sightline issues from Fortune's and Hoffman's seats.[124] And, in fact,

---

[120] Def. Ex. 622, 623.

[121] Def Ex. 743-D; 3/9 Tr. at 185.

[122] Def. Ex. 740, 741.

[123] Def. Ex. 545; 3/9 Tr. at 186-87.

[124] 3/4 Tr. at 101:2-7. 3/4 Tr. at 105:18-25; 106:7-9.

they are evidence of the contrary.  The fact that the NFL identified those seats and marked them as "restricted view" in its quality control process is only further evidence that the NFL did not intend for fans to receive undisclosed obstructed views.

Third, the notation "1-OBST" in Geoff Otto's notebook near Mr. Fortune's seat does not support a jury finding of fraudulent intent at the time the tickets entered the stream of commerce. Geoff Otto testified that he arrived in Dallas on the Saturday before the game and first went to Cowboys Stadium to begin inspecting seats on "the Sunday before the game" (January 30, 2011).[125]  His notation in his notebook could only have been made sometime on or after January 30, 2011.  That is at least a full week after the second group of tickets entered the stream of commerce when they were provided to the participating teams after they won the conference championship games on Sunday, January 23.[126]  That notation is not evidence of the NFL's knowledge or intent at the time the tickets entered the stream of commerce.  Indeed, the fact that the NFL hired Geoff Otto and other to walk the stadium, verify sightlines and bring issues to the attention of Populous is only further evidence that the NFL did not intend for fans to receive obstructed view seats.[127]

At worst, even if the quality control process broke down for one of Fortune's seats and he ended up with an obstructed view, that would not be evidence that the NFL fraudulently intended to provide him an obstructed view seat (and even more so would not be any evidence of the

---

[125] 3/6 Tr. at 37:7-20.

[126] 3/4 Tr. at 62:19-23; 3/5 Tr. at 99:17-100:4.  In fact, by January 30 Fortune had already purchased his ticket from his sister. 3/5 Tr. at 187:15 – 188:6.

[127] *See* 3/9 Tr. at 204:11-25.

NFL's intent at the time that Fortune's ticket entered the stream of commerce). As this Court has recognized, "mere failure to perform a contract is not evidence of fraud." [128]

Given the absence of any direct or circumstantial evidence of fraudulent intent, Plaintiffs' arguments about the NFL's purported motives to commit fraud are beside the point. Mere evidence of a "motive" to commit fraud is not sufficient by itself to establish fraudulent intent.[129] And, in any event, Plaintiffs' motive allegations are entirely illogical and unsupported by the trial evidence.

First, throughout this case and at trial Plaintiffs have argued that the NFL's motive was to accommodate Jerry Jones' desire to break the attendance record. As an initial matter, this makes no sense as a motive for fraud because the NFL did not need to conceal an obstructed view to sell Plaintiffs' seats and count them among those in attendance. It is undisputed that the NFL sold 1,450 other seats that were marked with a restricted view legend, and also sold more than 3,000 tickets to view the game on TV screens outside the Stadium. All of these ticketholders were counted among those in attendance.[130] Plaintiffs' seats would likewise have been counted among the attendance whether they were marked restricted view or not. In any event, there is no evidence whatsoever that the NFL ever considered adding Plaintiffs' seats, or any temporary

---

[128] Dkt. No. 89 at 7 (citing *Formosa*, 960 S.W.2d at 48); *see also Broyhill Furniture Indus., Inc. v. Murphy*, 2013 WL 4478172, at *8 (Tex. App.—Dallas Aug. 20, 2013, no pet. h.).

[129] *See Fisher v. Household Life Ins. Co.*, 2013 WL 3792620, at *9 (D. Kan. July 19, 2013) (summary judgment proper on fraud claim because plaintiff adduced no evidence of intent to deceive, other than a purported profit motive; "The fact that defendants would profit from premiums does not allow a jury to infer that defendants had fraudulent intent"); *Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 606 (D. Kan. 2004) (granting summary judgment on plaintiff's civil RICO case based on fraud, in part, because "a reasonable jury could not infer that [defendant] had fraudulent intent. At most, plaintiffs have shown that [defendant] had a profit motive to obtain a non-replacement provision. Such generalized motives are insufficient for a jury to find fraud"); *see also IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124, 130-32 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding insufficient as a matter of law evidence that did not establish that defendant did not intend to perform at the time the promises were made); *Cf. Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("allegations of motive and opportunity standing alone will not suffice" to support an inference of scienter in context of securities fraud claim).

[130] *See* Pls.' Ex. 54.

seats, to break the attendance record.  What the NFL considered with respect to the attendance record was: (1) counting non-ticketed credentials (i.e., media and staff) among attendance, (2) counting fans who purchased seats to the Party Plaza outside among attendance, and (3) adding standing room tickets and capacity to suites.[131] There were no discussions of adding seats to try to break the attendance record.[132]  Rather, the number of saleable seats in the Stadium declined over time.  The number of saleable seats in final bid provided to the NFL was 93,221;[133] in the November 2010 version of the Ticket Capacity Plan it was 88,900;[134] and it remained at 88,900 in the final, January 2011 version of the Ticket Capacity Plan.[135]  The number of temporary seats on the main concourse level (where the Curves were located) also went down over time.[136] Rather than use temporary seats to break the record, the NFL actually removed those seats it identified as having unobstructed views of the field. Plaintiffs themselves acknowledge that the NFL killed at least 108 temporary seats prior to the game due to unacceptable views, which is entirely inconsistent with Plaintiffs' theory that the NFL was willing to defraud fans to break the record.

Indeed, the NFL actually tried to discourage host cities from promising more seats than they could deliver. As Supovitz explained at trial, the Super Bowl XLV Bid Response Questionnaire cautioned bid committees to "consider the number [of seats] carefully," as "[a]ny revenue shortfall due to over-estimation of seating will be paid to the NFL by the host

---

[131] 3/3 Tr. at 116:2-10, 122:2 – 127:11; 3/5 Tr. at 41:4-7.

[132] 3/3 Tr. at 116, 117:22 – 118:2.

[133] Def. Ex. 176.

[134] Def. Ex. 531.

[135] Def. Ex. 536.

[136] Def. Exs. 507, 510, 535; 3/9 Tr. at 165:1-2.

committee."[137] If the host committee installed seats that were not acceptable to the NFL and had to be removed, it was the host committee (not the NFL) that would "bear the cost of the revenue that would be missing."[138]

Second, Plaintiffs have argued that the NFL's motive to defraud them was to maximize revenues and profits.  Any additional revenue that the NFL stood to gain from purportedly selling undisclosed obstructed view seats to Fortune and Hoffman would be infinitesimal and hardly provides a motive for fraud.[139]  The difference in price between a regular ticket and a "restricted view" ticket for Super Bowl XLV was $300.[140]  Even if the NFL lost all revenue from Hoffman and Fortune's seats, it would lose at most $4,500 (i.e., five total seats x $900/seat). Given the large amount of revenue that is generated by the Super Bowl, both from fans in attendance as well as television and other revenue sources, it is pure fantasy that the NFL would commit fraud to get several hundred extra dollars from Hoffman and Fortune.  Indeed, there is no dispute that the NFL killed 108 seats due to sightline issues, which alone resulted in more than $90,000 in lost in revenues.

Lastly, Plaintiffs have speculated the NFL committed fraud to "avoid a public relations spectacle," speculating that the NFL did not want to disclose the sightline issues allegedly discovered after the tickets had been printed because it feared a public relations issue. This argument is not only false, but without reason.  Plaintiffs' argument ignores the fact that the NFL could and did address sightline issues found after the printing of the tickets in a number of ways without concern and without any "public relations" issue, including killing certain seats before

---

[137] 3/3 Tr. at 54:10-16; Def. Ex. 501.

[138] 3/3 Tr. at 55:21 – 56:7.

[139] *See Fisher v. Household Life Ins. Co.*, 2013 WL 3792620 at *9 (D. Kan. July 19, 2013); *Waddell & Reed Fin. Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 606 (D. Kan. 2004).

[140] 3/3 Tr. at 97:19-25.

they were sold, adjusting the angle of certain rows, and meeting fans on game day to relocate them to other seats.

**B.    The NFL is entitled to judgment as a matter of law on Fortune and Hoffman's claims of fraudulent inducement because they have no evidence that they were induced to purchase their tickets by a false representation or actionable omission by the NFL regarding sightlines, or that they actually and justifiably relied on any such representation.**

To prove their claim for fraudulent inducement, Plaintiffs Fortune and Hoffman also must prove that they acted in reliance on a false representation or actionable omission by the NFL regarding the view of the playing field from their seats in purchasing their tickets, i.e. that that they were induced to purchase their tickets by fraud.[141]  They have not offered any such evidence.

Neither Fortune nor Hoffman purchased their tickets from the NFL.[142]  Both admit they had no communications with the NFL before purchasing their tickets.[143]  There is accordingly no evidence that the NFL made any representation to Fortune or Hoffman regarding the view of the field from their seats that could have induced them to purchase their tickets.

There is also no evidence that Plaintiffs relied on any actionable omission in deciding to purchase tickets.  As this Court has recognized, "[g]enerally, under Texas law, a failure to disclose information does not amount to a fraudulent misrepresentation absent a fiduciary or confidential relationship between the parties."[144]  Here this Court has already found that there is

---

[141] *See* Dkt. No. 273 at 44-46.

[142] 3/5 Tr. at 187:15-16 ("Q: Mr. Fortune, you purchased your tickets from your sister. Is that correct? A: That's correct."); 3/6 Tr. at 92:7-11 (Hoffman testimony confirming he purchased tickets from "an organization called TicketsNow by Ticketmaster").

[143] 3/5 Tr. at 188:7-16 (Fortune); 3/6 Tr. at 92:12-17 (Hoffman).

[144] Dkt. No. 325 at 21; *see also Becker v. Nat'l Educ. Training Group, Inc.*, 2002 WL 31255021, at *6 (N.D. Tex. Oct. 7, 2002) (Lynn, J.) ("the Fifth Circuit has repeatedly held that under Texas law a failure to disclose is not actionable fraud unless a fiduciary or confidential relationship exists between the parties."); *see Coburn Supply Co. v. Kohler Co.*, 342 F.3d 372, 377-78 (5th Cir. 2003) (no duty to disclose because no fiduciary or confidential relationship); *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 525 (5th Cir. 2001) ("Absent a fiduciary

no fiduciary or confidential relationship between the NFL and Plaintiffs.[145]

Plaintiffs therefore can only rely on the theory that "the terms of the ticket amounted to a representation that the seats purchased did not have restricted views, since tickets with obstructed views were so marked."[146]   Fortune and Hoffman did not, however, receive their tickets until *after* deciding to purchase them.[147]   They could not have been induced into buying their tickets by any representation or omission on the ticket itself.   Absent proof of inducement and reliance, Fortune and Hoffman cannot prove a claim for fraudulent inducement.   Their claim amounts to no more than an alleged failure of the NFL to perform its contractual obligations under the ticket.

### C.   The NFL is entitled to judgment as a matter of law on Plaintiffs' claim for exemplary damages.

Even if Plaintiff Fortune or Hoffman can get to a jury on their fraud claim, their claim for exemplary damages fails as a matter of law for two independent reasons.

### 1.   The NFL is entitled to judgment as a matter of law because no reasonable jury could find fraud by clear and convincing evidence.

---

or confidential relationship, the failure to disclose information is not actionable as fraud."); *Bay Colony, LTD v. Trendmaker, Inc.*, 121 F.3d 998, 1004 (5th Cir.1997) ("Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists."); *Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 985 (5th Cir. 1996) ("Absent a fiduciary of confidential relationship, the failure to disclose information is not actionable as fraud."); *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005) ("A reasonable jurist might well conclude, certainly after Bradford, that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship. This court has so held in *Coburn*, the only Fifth Circuit case that discusses the relevant portion of *Bradford*.").

[145] Dkt. No. 325 at 21.

[146] Dkt. No. 325 at 21.  To the extent Plaintiffs complain about a failure to disclose *after* they purchased their tickets, that is not a fraudulent inducement claim.  *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) ("Fraudulent inducement also requires proof of an underlying contract which was induced."); *Haase v. Glazner*, 62 S.W.3d 795, 797-98 (Tex. 2001) ("Haase argues that by its nature a fraudulent inducement claim presupposes that a party has been induced to enter a contract.  When a party has not been induced into a contract, he asserts, there is no detrimental reliance and therefore no fraudulent inducement claim.  We agree.").  It is at most a fraudulent concealment claim, which this Court has already dismissed as barred by the independent injury rule.  Dkt. No. 89 at 4-5.

[147] 3/5 Tr. at 149:22 – 150:2; 187:15-188:2 (Fortune); 3/6 Tr. at 92:9-11 (Hoffman stating that he bought tickets online from Ticketsnow by Ticketmaster).

Under Texas law, a party is entitled to recover exemplary damages only if he proves by clear and convincing evidence that the harm for which he seeks exemplary damages resulted from the defendant's fraud.[148] Fortune and Hoffman have not presented ***clear and convincing*** evidence for a reasonable jury to find that the harm with respect to which they seek recovery of exemplary damages resulted from the NFL's fraud. As discussed at length above, there is no legally sufficient evidence at all that the NFL intended to defraud either Hoffman or Fortune by selling them seats with undisclosed obstructed views of the playing field. To the contrary, the NFL undertook months of preparations to ensure that no such seats would be sold, and had in place numerous mitigation levels to address the concerns of fans who believed their views of the playing field were obstructed. Even if a reasonable jury could find fraud by a preponderance of the evidence (which they cannot), no reasonable jury could find fraud by clear and convincing evidence.

### 2. The NFL is entitled to judgment as a matter of law because no reasonable jury could find reprehensible conduct by the NFL sufficient to sustain an award of exemplary damages.

Exemplary damages "should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."[149] This case simply does not involve the type of reprehensible conduct that justifies the imposition of exemplary damages.[150]   It is undisputed that no one was physically harmed, and no one's health or safety was compromised.    The

---

[148] Tex. Civ. Prac. & Rem. Code § 41.003(a); *See, e.g., Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 628-29 (Tex. 2004) (no clear and convincing evidence of actual malice to support an award of punitive damages); *Fields v. Keith*, 174 F. Supp. 2d 464, 482-83 (N.D. Tex. 2001).

[149] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

[150] *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 660 (Tex. 2012) (exemplary damages are recoverable if plaintiff proves actual damages plus "outrageous, malicious, or otherwise reprehensible conduct" by defendant).

alleged conduct by the NFL was an isolated incident, not repeated misconduct.  There was no evidence that any damages suffered by any Plaintiff has left them in financial ruin.  Most importantly, there was no evidence that any damage to a Plaintiff resulted from "intentional malice, trickery or deceit" by the NFL, as opposed to mere accident. [151]

Not a single one of the factors that are relevant to determining the reprehensibility of a defendant's conduct have been met here. To the contrary, the NFL undertook extensive efforts to ensure that seats would not have obstructed views unless clearly marked, and also had in place significant mitigation measures in the event a fan was displeased with his or her seat. The NFL's conduct in planning Super Bowl XLV most certainly is not "reprehensible" as to warrant punitive damages.

###### D.   The NFL is entitled to judgment as a matter of law on Burgwin's claim based on her daughters' two tickets because she has not presented legally sufficient evidence of any damages.

The NFL is entitled to judgment as a matter of law on Burgwin's claim on two of her tickets – the two tickets used by her daughters – because there is no legally sufficient evidence of any damages associated with those tickets.  There is no evidence from which the jury could determine whether Ms. Burgwin's daughters were relocated to a better seat, an equivalent seat, or a worse seat.[152]  Nor is there any evidence from which the jury could find in Ms. Burgwin's favor on her allegation that her daughters missed part of the game.[153]  There is simply a complete absence of evidence from which the jury could find any damages associated with the two tickets used by Ms. Burgwin's daughters.

---

[151] *See Tony Gullo Motors I. L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006) (*quoting BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996)).

[152] 3/6 Tr. at 245:20 – 253:3; 3/6 Tr. at 250:22-25 (Burgwin testimony that her daughters "did not sit with us.").

[153] *Id.*

**E.**     **Other grounds for granting judgment as a matter of law.**

The NFL is entitled to judgment as a matter of law on the breach of contract claims brought by Ibe, Laffin, Wanta, Burgwin, and McLear because the NFL did not breach the ticket contracts under the law of revocable licenses and/or the "SUPER BOWL TICKET TERMS" on the back of the tickets.[154] The NFL performed its contractual obligation to provide a refund to Ibe, Laffin, and Wanta, and provided a refund to Burgwin and McLear despite also providing them alternative seats to the Super Bowl XLV game.

The NFL is entitled to judgment as a matter of law on the breach of contract and fraudulent inducement claims by Fortune and Hoffman because they have not presented legally sufficient evidence that they had obstructed views of the playing field during the Super Bowl XLV game. As such, their breach of contract claims fail as a matter of law.

The NFL is entitled to judgment as a matter of law on the breach of contract claims brought by Ibe, Laffin, Wanta, Burgwin, McLear, Fortune, and Hoffman because they have not presented evidence that they suffered the amount of actual economic damages they claim to have suffered as a result of the NFL's alleged breach of contract. Moreover, the damages that Plaintiffs seek in this case are not legally recoverable on a revocable license such as the Super Bowl XLV ticket or under the "SUPER BOWL TICKET TERMS" on the back of the tickets. The NFL has already offered Ibe, Laffin, Wanta, Burgwin, and McLear more than their maximum recoverable economic damages through voluntary reimbursement offers.[155] Because Plaintiffs are not entitled to greater economic damages than they have already been offered, their breach of contract claims are also rendered moot.[156]

---

[154] *See generally* Dkt. No. 273 at 22-24; Dkt No. 311 at 2-3.

[155] *See* Dkt. No. 273 at 16-17; 26-31; 38-39.

[156] *See generally* Dkt. No. 273 at 16-17; 26-31; 38-39.

The NFL is entitled to judgment as a matter of law on Burgwin's claim for breach of contract because there is no evidence that the NFL breached the ticket contract with Burgwin by relocating her and her husband to "lesser quality" seats. Burgwin testified only that her replacement seats were in "the fourth level."[157] There is no evidence of the specific seats to which she was relocated or the value of her replacement seats.[158] But, as the Court noted in its Order denying class certification, the fact that a particular replacement seat may have been in a row higher than the ticketholder's original row does not make that a "lesser quality" seat.[159] In fact, there were seats in the 400 level with a $900 face value, the same as Burgwin's original seats.[160] Burgwin has not presented legally sufficient evidence regarding the value of her original seats or of the replacement seats. Moreover, Burgwin had no expectation of being seated in a specific seat because she had no idea where her seats would be located when she purchased her tickets.[161]

The NFL is entitled to judgment as a matter of law on McLear's breach of contract claim because McLear has not presented legally sufficient evidence that he suffered any damages from being relocated. McLear has failed to present any evidence that the tickets he received had a lower value than those for which he originally paid. Moreover, even if McLear missed a portion of the Super Bowl XLV game due to his relocation, the NFL is still entitled to judgment as a matter of law on his breach of contract claim because there is no evidence that he suffered any damages due to the delay. "[P]arties generally cannot recover for inconvenience or other non-

---

[157] 3/6 Tr. at 251:1-3.

[158] 3/6 Tr. at 251; *see also* Def. App. Ex. 7-Q at 309 (Burgwin Depo. at 32:18-22).

[159] Dkt. No. 269 at 33-34.

[160] Def. Ex. 542-D (pending admission).

[161] 3/6 Tr. at 252:22-24.

monetary injury" under Texas law.[162] Even if a party can recover for "wasted time" or other intangible loss, the plaintiff must "provide evidence supporting a monetary value for that loss."[163] McLear has provided no evidence of the monetary value associated with the time spent being relocated to alternative seats.

The NFL is entitled to judgment as a matter of law on McLear's breach of contract claim because there is no legally sufficient evidence that the NFL was responsible for McLear's delay in accessing his seat to the Super Bowl XLV game. Although McLear claims that he arrived at his replacement seats after opening kickoff, he admits that when he arrived at the stadium he mistakenly proceeded to the wrong seats in Section 229A (rather than Section 230A).[164] He then elected to remain in the wrong seats even after learning that his seats were elsewhere.[165] Having scanned through security at approximately 4:00 p.m.,[166] McLear could have and would have reached his replacement seats in time for the game but for his decision to remain in the wrong seats. If McLear did not reach his replacement seat in time for the opening kickoff, that is not because of a breach of contract by the NFL.[167]

---

[162] Dkt. No. 269 at 24 (citing *Dean v. Dean*, 821 F.2d 279, 281 (5th Cir. 1987)); *Multi-Moto Corp. v. ITT Commercial Fin. Corp.*, 806 S.W.2d 560, 569 (Tex. App.—Dallas 1990, writ denied); *Kelly v. Dent Theaters*, 21 S.W.2d 592, 594 (Tex. Civ. App.—Waco 1929, no writ).

[163] Dkt. No. 269 at 24-25.

[164] 3/6 Tr. at 151:9-12 (seat location); 155:7-18; 156:4-7; 164:1-7.

[165] 3/6 Tr. at 163:21-25 (Q: "[Y]ou went back to the seats in 229, you stayed in 229A for a little while longer. Is that right? A: Yeah.").

[166] 3/6 Tr. at 161:7-12.

[167] *See* Dkt. No. 269 at 23 (Order denying Class Cert.) (distinguishing between delays attributable to the NFL and delays caused by "individual decisions outside of the NFL's control"). The absence of a causal connection between any delay associated with obtaining replacement tickets and missing part of the game is fatal to McLear's breach of contract claim. *See Clearview Props., L.P. v. Prop. Tex. SC One Grp.*, 287 S.W.3d 132, 139–40 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (holding that plaintiff's failure to secure financing for deal caused its damages, rather than any action by defendant in breach of contract claim); *Tidwell Props., Inc. v. Am. First Nat'l Bank*, 2006 WL 176862, at *3 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding that defendant's failure to disclose sublease did not cause breach-of-contract damages because plaintiff's deal fell through for reasons independent of failure to notify plaintiff).

The NFL is entitled to judgment as a matter of law on Plaintiffs' fraudulent inducement claim because Plaintiffs have not presented any evidence that the NFL knew that any representation concerning the view of the field from Plaintiffs' seats was false when made or was made recklessly without knowledge of its truth.[168] To the contrary, the NFL undertook extensive quality-control efforts to ensure that Plaintiffs' seats had unobstructed views of the playing field. Nor have the plaintiffs presented legally sufficient evidence that the NFL intended to induce Fortune or Hoffman to purchase Super Bowl XLV tickets based on a false representation regarding the anticipated view of the field from their seats. The evidence conclusively demonstrates that the NFL did not have such intent. Through its extensive quality control process, it ensured that no seats would have obstructed views of the playing field unless clearly marked "Restricted View."

Plaintiffs also have failed to present legally sufficient evidence that they suffered any actual economic damages from any misrepresentation or omission by the NFL regarding the anticipated view of the playing field from their seats.

In addition to the reasons stated above, the NFL is entitled to judgment as a matter of law on Plaintiffs' breach of contract and fraudulent inducement claims because Plaintiffs' proposed jury instructions do not present a legally correct measure of damages. Plaintiffs claim that their damages are equal to "the amount of money necessary to restore the plaintiff to the position he or she would have been in if the NFL had not committed fraud, and may include, without limit, any expenses, lost wages, and lost vacation time, the plaintiff undertook to attend the Super Bowl."[169] This standard is legally incorrect because it does not take into account the benefit of the value the plaintiff received. "Out of pocket" damages are measured as the amount of damages equal to the

---

[168] Dkt. No. 273 at 44-45; Dkt. No. 311 at 16.

[169] Dkt. No. 367 at 26 (Plaintiffs' Proposed Jury Charge).

difference between plaintiff's claimed expenses incurred in connection with attending the Super

Bowl XLV game and the value that the plaintiff received in connection with attending the Super

Bowl XLV game.[170]

**REQUEST FOR RELIEF**

For the foregoing reasons, at the close of Plaintiffs' case and before submission of the

case to the jury, Defendant NFL respectfully requests that the Court grant judgment as a matter

of law in its favor, pursuant to Federal Rule of Civil Procedure 50(a), and enter judgment for

Defendant NFL and against any and all claims asserted by Plaintiffs, and award Defendant NFL

all other relief to which it may be entitled.

March 10, 2015

By: /s/ Daniel H. Gold

George Bramblett, TBN 02867000
   george.bramblett@haynesboone.com
R. Thaddeus Behrens, TBN 24029440
   thad.behrens@haynesboone.com
Daniel H. Gold, TBN 24053230
   daniel.gold@haynesboone.com
Scott Ewing, TBN 24065214
   scott.ewing@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
(214) 651-5000
(214) 651-5940 (Facsimile)

**ATTORNEYS FOR DEFENDANT
NATIONAL FOOTBALL LEAGUE**

---

[170] *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) ("Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received."); *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) ("The out-of-pocket measure computes the difference between the value paid and the value received . . . .").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 10th day of March, 2015 on the individuals listed below:

R. Jack Ayres, Jr.
Christopher S. Ayres
LAW OFFICES OF R. JACK AYRES, JR., P.C.
4350 Beltway Dr.
Addison, TX 75001

Michael J Avenatti
Jason M. Frank
Lisa A. Wegner
EAGAN AVENATTI , LLP
520 Newport Center Dr., Suite 1400
Newport Beach, CA 92660

By: /s/ Daniel H. Gold